[Civil No. 4135. Filed December 4, 1939.]

[96 Pac. (2d) 407.]

MYRTLE ADA THOMAS, Petitioner, v. THE IN-
DUSTRIAL COMMISSION OF ARIZONA, and
L. C. HOLMES, Chairman, and SAM PROCTOR
and MORTIE A. GRAHAM, Members of The In-
dustrial Commission of Arizona, and THE ARI-
ZONA BOARD OF HEALTH, Respondents.

Mr. Samuel H. Fowler and Mr. Burt H. Clingan, for Petitioner.

Mr. Rouland W. Hill and Mr. Howard A. Twitty, for Respondents.

LOCKWOOD, J.—Myrtle Ada Thomas, hereinafter called petitioner, applied to the Industrial Commission of the State of Arizona, hereinafter called the commission, for compensation which she alleged was due her as a result of the death of her husband, Ralph Thomas. The commission heard the evidence, and found that it was insufficient to establish that the death of Mr. Thomas, who was an auditor in the office of the Arizona state board of health, occurred from an accident arising out of and in the due course of his employment. A rehearing was asked and granted, and the original award was affirmed, whereupon the case was brought before us for review.

The only question in the case is whether the evidence reasonably sustains the finding of the commission that Mr. Thomas was not in the due course of his employment at the time of the injury which resulted in his death. In considering this question, we are of course bound to construe the evidence as favorably as it reasonably may be construed to sustain the award. *Blankenship* v. *Industrial Com.*, 34 Ariz. 2, 267 Pac. 203; *Young* v. *Hodgman & Mac Vicar*, 42 Ariz. 370, 26 Pac. (2d) 355; *Johnson* v. *T. B. Stewart Const. Co.*, 37 Ariz. 250, 293 Pac. 20.

The material evidence may be stated as follows: Ralph Thomas for about six years had been an auditor for the Arizona state board of health, continuing in his position through several changes of administration. For some time immediately prior to the accident which resulted in his death, his superior officer was Dr. George Truman, the state superintendent of health, while Forest Doucette was the secretary for the latter. Dr. Truman had been dissatisfied with the amount of traveling about the state which Mr. Doucette and Mr. Thomas had done, and felt that a good deal of it was unnecessary and unreasonably running up the expenses of the office, so about two or three weeks before the accident, he called them into his office and told them in most emphatic terms that they were not to travel out of the office on state business without his express permission. These instructions, in fact, were so peremptory that one of the two offered to resign, because he felt he was being unduly criticized. A large portion of the expense of both the state board of health and the county units, which act under its supervision, is paid by the federal government, and it is necessary, in order to obtain these federal funds, that a budget be prepared and submitted to the federal department about the first of July of each year. Previously Mr. Thomas had taken part in the preparation of this budget, but during 1937 these duties had been taken away by Dr. Truman, and his duties in connection therewith were limited to examining claims as they came in and segregating them to the different budget items so that they could be charged properly. The budgets themselves were made up by Dr. Truman, with the assistance of another employee of the Phoenix office.

Mr. Thomas' married daughter was living in Tucson, and in the spring of 1937 she was advised to

have a tonsillectomy performed. Her mother went to
Tucson on May 16th to be with her at the time of the
operation, and it was understood that after the opera-
tion Mr. Thomas would come to Tucson and take his
wife back to Phoenix. For certain reasons this opera-
tion, which was to have taken place about the 17th
or 18th, was postponed, and Mr. Thomas was advised
to this effect, and that it would not be necessary for
him to come down that week. He advised his wife
by letter, which she received either the 20th or 21st
of May, that notwithstanding this fact he intended
coming down because he had some business in con-
nection with his official duties. His wife called him
over the phone and urged him to come by train, but
he replied that he could not as he could not make the
proper connections and transact his business. On
Saturday morning, May 22d, he started for Tucson in
an automobile. There is no doubt that he did not
receive permission to make this trip from Dr. Truman,
Mr. Doucette, or anybody else in the Phoenix office
who was authorized to give such permission, and that
it was contrary to the express directions of Dr. Tru-
man so far as state business was concerned. Some
twenty-five or thirty miles out of Tucson he lost con-
trol of his car, and received serious injuries in the
wreck which ensued. He was taken immediately to a
hospital in Tucson where he remained until his death
some four days later. While he was in the hospital,
and still conscious, he made various remarks to his
wife and to his attending physician and nurse that
he was on his way to Tucson to see the county health
officer, Dr. Louis H. Howard, in regard to business con-
nected with the department, but did not go into detail
as to just what the business was. Dr. Howard testi-
fied that he had no information that Mr. Thomas was
coming to Tucson to see him, but that he did at the
time have in preparation his portion of the budget

for the ensuing year, and expected, in accordance with the previous practice of the state board of health, that someone from that department would .come down and assist in making up the budget, and that Mr. Thomas, on previous occasions, had worked with him in that matter. It also appeared that at the time of the accident Mr. Thomas had with him a brief case containing various papers pertaining to the work of the board of health.

The evidence also shows that the office of the state board of health was considerably upset because there was some question as to the removal of Dr. Truman, then superintendent, and the appointment of Dr. Coit Hughes, who succeeded him shortly after the accident, and that Mr. Thomas was a close friend of Dr. Hughes and expected to continue in his then position, while Mr. Doucette was to lose his position at the time Dr. Truman went out. It was also the testimony of Mrs. Thomas, in regard to asking for authority to make trips, "That wasn't dad's disposition to have to ask people, you know, if you know him." Mr. Doucette stated that a few days before the 22d, Mr. Thomas said that it was his intention to leave for Tucson over the week end to visit his married daughter who was ill.

We think that two different conclusions might reasonably be drawn from the foregoing evidence as to the primary purpose of Mr. Thomas' trip to Tucson on May 22d. On the one hand, we have his statement to Mrs. Thomas that he was going down on business, the statements made by him in the hospital, and the fact that his brief case contained papers referring to the state board of health, together with Dr. Howard's statement that he expected someone to come down within the next few weeks to consult with him in regard to the budget. On the other hand, we have the statement of Mr. Doucette that Mr. Thomas had told

him he was going down to see his daughter; the fact that he had no duties in regard to the making of the budget for the ensuing year, and the positive prohibition of his superior officer against making trips out of the office for the purpose of transacting any state business without express permission, from which last it might reasonably be inferred that it is not likely an employee would deliberately disobey the order of his superior, and thereby risk dismissal, by doing something which he had been expressly and emphatically forbidden to do. An answer to this last argument is that Mr. Thomas knew Dr. Truman was about to retire from the superintendency and be succeeded by a close friend of Mr. Thomas who had promised to retain him in office, and considering this in connection with the statement of Mrs. Thomas that Mr. Thomas resented anyone attempting to tell him what he should or should not do, it might well be believed that he went on state business, in defiance of the order of his superior trusting that Dr. Hughes would rescind the order or condone the offense.

If the trip was primarily for the purpose of performing his duties as auditor, and incidentally only to visit with his wife and daughter, he was in the course of his employment. If on the other hand, his primary purpose was to visit with his family, and the business with Dr. Howard was incidental, he was not. But whether the one or the other conclusion as to his purpose in going to Tucson is the more reasonable, there can be no question that the trip was made in direct disobedience to the positive and explicit orders of his superior officer. If this be true, does it affect the situation?

The question of whether an employee who violates the instructions of his superior and receives an injury while so doing is entitled to compensation under

the various workmen's compensation acts, has been before the courts of other jurisdictions many times, but it is a question of first impression in this state, and we, therefore, consider it upon both reason and authority. The cases which disallow compensation under such circumstances are many; those which permit it are equally numerous. Usually the court, in rendering its decision, declares explicitly, or implicitly, that the answer must be determined by the facts of the particular case, but running through practically all of the cases we find a fairly consistent and clear standard of demarkation laid down.

The English compensation law is, in principle, the model upon which nearly all of our acts are based, although of course they differ in detail. In the case of *Bourton* v. *Beauchamp,* 1920 App. Cas. 1001, it was said, quoting from Higley's case, 1917 App. Cas. 372:

" 'I doubt if any universal test can be found. Analogies, not always so close as they seem to be at first sight, are often resorted to, but in the last analysis each case is decided on its own facts. There is, however, in my opinion, one test which is always at any rate applicable, because it arises upon the very words of the statute, and it is generally of some real assistance. It is this: Was it part of the injured person's employment to hazard, to suffer, or to do that which caused his injury? If yea, the accident arose out of his employment. If nay, it did not, because what it was not part of the employment to hazard, to suffer, or to do cannot well be the cause of an accident arising out of the employment. To ask if the cause of the accident was within the sphere of the employment, or was one of the ordinary risks of the employment, or reasonably incidental to the employment, or, conversely, was an added peril and outside the sphere of the employment, are all different ways of asking whether it was a part of his employment that the workman should have acted as he was acting, or should have been in the position in which he was,

whereby in the course of that employment he sustained injury.' " And applying this rule to the facts of the particular case, it was said: " . . . The deceased was not doing a permitted act carelessly; he was doing an act which he was prohibited from doing . . . ".

and compensation was denied.

This rule was affirmed in the later case of *Moore & Co.* v. *Donnelly*, 1921 App. Cas. (1) 329. A similar question arose in the Supreme Court of Michigan in the case of *Gacesa* v. *Consumers' Power Co.*, 220 Mich. 338, 190 N. W. 279, 281, 24 A. L. R. 675. The court recognized that at that time most of the precedents were English cases, and it said:

"We, therefore, have before us the question of whether an accident arises out of and in the course of the employment, where it occurs when the employé is, in a place where he is, by the orders of his employer, prohibited from going, and when he is doing an act which he has by orders of his employer been prohibited from doing. The courts of this country have not dealt with this question with any degree of frequency. We shall presently refer to some of the American decisions. The question has been before the courts of England under a statute containing like language to ours, and from which statute the language of our statute is taken. We have examined the following English cases: . . . "

and continued:

"We are persuaded that we should follow the doctrine of the English cases: (1) They adopt a construction of language used in a statute, which language after such construction was written into our statute; (2) because we conceive it to adopt a correct rule. . . . "

██ In *Fournier's Case*, 120 Me. 236, 113 Atl. 270, 272, 23 A. L. R. 1156, the court again reviewed the cases and said:

"If, then, the employee is in a place where he is prohibited from being by positive orders of his em-

ployer by reason of the danger, or has taken a certain course in going from one place to another which he is prohibited from taking by his employer for the same reason, notwithstanding it is within the period of his employment, and his purpose in going to the other place is to perform some of his duties he is engaged to perform, he cannot be said, while in the forbidden place or while going by the forbidden route or means, to be acting in the course of his employment within the meaning of the Compensation Act, because he is not in a place where he reasonably may be in the performance of any of his duties. . . . ''

And stated the converse of the rule in the following language:

'' . . . If, however, he is in the place where his duties are intended to be performed, and where, of course, he reasonably may be, and is engaged in the performance of them and only violates some rule relating to his conduct while in such performance, he is still acting in the course of his employment, even though he performs them recklessly and knowingly exposes himself to danger in violation of orders, and unless the injury can be said to have been inflicted by 'willful intention,' may recover compensation.''

We think the rule thus laid down is approved by the large majority of the cases, although the conclusion as to whether the injured employee was in the sphere of his employment at the time of the accident varies greatly. But in most of the cases where the employee was in a place where he was instructed he must not be, it is held that he is out of the sphere of his employment. *Hibberd* v. *Hughey,* 110 Neb. 744, 194 N. W. 859; *Jones* v. *Sloss-Sheffield Steel & Iron Co.,* 221 Ala. 547, 130 So. 74; *Rautio* v. *International Harvester Co.,* 180 Minn. 400, 231 N. W. 214.

The distinction is pointed out by the Supreme Court of Alabama, in *Moss* v. *Hamilton,* 234 Ala. 181, 174 So. 622, 623, in the following language:

"Our authorities, as well as those elsewhere, have drawn a clear distinction between prohibitions which limit the sphere of employment, and prohibitions which deal only with conduct within that sphere. A transgression of a prohibition within this latter class leaves the sphere of employment where it was, and of consequence will not prevent recovery, while a transgression of the former class carries with it the result that the employee has gone outside of the sphere. . . . "

We have examined carefully each and all of the cases cited by both petitioner and the commission. In practically all of the cases where the employee was in a place from which he had been excluded by the direct and positive instruction of his employer, he was held to be acting out of the sphere of his employment. It is true at first glance there are a few cases which would seem to imply otherwise, such as *Omaha Boarding & Supply Co.* v. *Industrial Com.*, 306 Ill. 384, 138 N. E. 106; *Frint Motor Car Co.* v. *Industrial Com.*, 168 Wis. 436, 170 N. W. 285; *Olson* v. *Robinson, Straus & Co.*, 168 Minn. 114, 210 N. W. 64; *Gurski* v. *Susquehanna Coal Co.*, 262 Pa. 1, 104 Atl. 801. On a careful examination of these cases, however, it will be found that in none of them was there an express instruction from the employer that no work of any nature was to be performed by the employee in the forbidden place, and that he was not even permitted to enter that place without express permission.

The rule above stated is not only sustained by the authorities but is in accord with justice and common sense. While it may be said that under a liberal construction of compensation laws, when an employee is instructed to perform a particular duty in a specified place, a departure from the method of work outlined should not bar him from compensation, to hold that he may also choose his own place for performing his duties, even though the employer positively prohibits

such place being so used on the ground that it is not in his interest that the work be done there, would be to make the employee, rather than the employer, the manager of the business, with no power in the latter to protect himself from liability or loss.

We are of the opinion that the rule laid down above as to departure from the sphere of employment, when applied to the undisputed facts of the present case, show that Mr. Thomas was not within the sphere of his employment on the trip in which he received the injuries which resulted in his death.

The award is affirmed.

ROSS, C. J., and McALISTER, J., concur.