RUBY L. FOWLER and BEVERLY KAY FOWLER, Appellants, v. BAAL-MANN, INC., a Corporation, Respondent, No. 41412—234 S. W. (2d) 11.

Court en Banc, November 13, 1950.

*Paul H. Koenig, R. Robert Cohn* and *Thomas L. Sullivan* for appellants.

*N. Murry Edwards, Ninian M. Edwards, Jr., Homer A. Cope* and *Walter A. Raymond* for respondent.

[12] CONKLING, J.—This Workmen's Compensation case was first heard and submitted in Division Two [13] of this court. After the filing of an opinion wherein only two of the judges concurred, that division, of its own motion, transferred the cause to the Court en Banc. After reargument before the entire court the divisional opinion was not adopted, and the cause was reassigned for preparation of another opinion. Portions of the divisional opinion are hereinafter used without quotation marks.

Ruby Fowler, a dependent widow, and Kay Fowler, a dependent child, made claim against Baalmann, Inc., for the death benefits ($13,142.00) provided by the Workmen's Compensation Law because of the death of James B. Fowler on March 11, 1947. Baalmann, Inc., operates a flying school and Fowler was in Baalmann's general employment as an instructor-pilot. Fowler and his "G. I." student, Fox, were killed on a night cross-country flight when a plane crashed near Kansas City. Baalmann, Inc., had not filed an election to come under the act and the Commission had not made a finding that it was under the act. Upon a hearing a referee found as a fact that Baalmann, Inc., "did not employ more than ten regular employees for the continuous period of 5½ consecutive work days from the date of its incorporation in March of 1946, to and including March 11, 1947." The referee concluded, therefore, as a matter of law, that Baalmann was not a major employer under the act and, consequently, that the Commission lacked jurisdiction to entertain the claim. Upon review the Industrial Commission affirmed the award denying compensation but modified the award with respect to the reasons for the denial: "We find from the evidence that the activities in which the employee was engaged, at the time of the accident which resulted in his death, were contrary to the instructions of the employer, and, therefore, the accident did not arise out of and in the course of employment." The Circuit Court affirmed the award and upon this appeal by the dependents, Baalmann, Inc., insists that both questions are for this court's consideration and

review as set forth in Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W. (2d) 647, Seabaugh v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W. (2d) 55 and Karch y. Empire Dist. Electric Co., 358 Mo. 1062, 218 S. W. (2d) 765.

Whether Baalmann, Inc., had the required number of employees, more than ten, and was therefore under the act depends upon the construction to be given the following sections, particularly Sections 3692(a) and 3695(a) and (d) of the Workmen's Compensation Law:

"Section 3690.

*Every employer and every employee,* except as in this chapter otherwise provided, *shall be conclusively presumed to have elected to accept the provisions of this chapter* and respectively to furnish and accept compensation as herein provided, unless prior to the accident he shall have filed with the commission a written notice that he elects to reject this chapter."

"Section 3692.

(a) *A major employer shall mean an employer who has more than ten employees regularly employed.*

(b) A minor employer shall mean an employer who has ten or less employees regularly employed.

"Section 3693.

Sections 3690, 3691 and 3692 of this chapter shall not apply to any of the following employments:

\* \* \* \* \* \*

Third: Employments which are but casual or not incidental to the operation of the usual business of the employer.

"Section 3694.

*The word 'employer'* as used in this chapter *shall be construed to mean:*

(a) *Every person,* partnership, association, corporation \* \* \* *using the service of another for pay.*

"Section 3695. (Laws Mo. 1947, Vol. 2, p. 438.)

(a) *The word 'employee' as used in this chapter shall be construed to mean every person in the service of any employer,* as defined in this chapter, under any contract of hire, express or implied, oral or written \* \* \*.

(d) *An employee who is employed by the same employer for more than five* [14] *and one-half consecutive work days shall for the purpose of this chapter be considered a regular and not a casual employee."*

During the period of November 1, 1946 to March 11, 1947, excluding Mr. Baalmann, who was the principal owner of the company and who neither worked nor drew a salary and Mr. Stickel, who prior to 1947 drew a salary in excess of $3,600.00 (Soars v.

Soars-Lovelace, Inc., 346 Mo. 710, 142 S.W. (2d) 866) there were twenty-one persons on the company's payroll. Baalmann contends, as is the fact and as the referee found, because the record does not show that at least eleven employees worked five and one-half consecutive days during the period, that it is not a major employer under the act. In so contending the respondent, as did the referee, applied Crevisour v. Hendrix, 234 Mo. A. 1012, 136 S. W. (2d) 404. In that case the court in determining whether a house mover and builder came within "A major employer shall mean an employer who has more than ten employees regularly employed" (Sec. 3692(a)) ignored Section 3695(a) and applied Section 3695(d) which says "An employee who is employed by the same employer for more than five and one-half consecutive work days shall for the purpose of this chapter be considered a regular and not a casual employee" and held that an employer was not under the act as a major employer unless eleven persons worked or were employed for five and one-half consecutive days. The court said, "the employes must work for more than five and one-half consecutive days. They must be 'more than ten' or, in other words, at least eleven. They must be employed for five and one-half consecutive work days. The 'five and one-half consecutive work days' applies, not to the individual employe but to the class or group of employes, to-wit, 'more than ten.' The employer is not brought within the act, if he at different times (intermittently) and not concurrently, employs more than ten different employes scattered through the period of employment. In other words the number 'ten or more' is as important in determining the status, as is the length of the employment of 'five and one-half consecutive work days.' "

This reasoning and this contention overlook Section 3695(a) and misinterpret the purpose of Section 3695(d). Section 3695(a) is the general inclusive definition of an "employee." Under that Section *"every person in the service of any employer"* is an "employee." And the test of whether an employer is a "major" or a "minor" employer is not that he shall employ more than ten employees who must have worked more than five and one-half days consecutively but *"who has more than ten employees regularly employed."* The phrase "regularly employed" is not defined in the act. And "regularly," as used in the statute, "refers to the question whether the occurrence is or is not in an established mode or plan in the operation of the business, and has no reference to the constancy of the occurrence. The word, 'regularly,' is not synonymous with constantly or continuously. *The work may be intermittent and yet regular. Men may be regularly but not continuously employed."* McDonald v. Seay, 62 Ga. A. 519, 8 S.E. (2d) 796, 797, Norris v. Koenig, (Mo. A.) 183 S.W. (2d) 160.

For example, in Sonnenberg v. Berg's Market, 227 Mo. A. 391, 55 S.W. (2d) 494, four additional butchers were "casual" and not "regular" employees. But it was held that the extra work "was regular and recurrent. It came with regularity every Saturday. It was not unforeseen or unexpected, accidental or fortuitous." In Carrigan v. Western Radio Co., (Mo. A.) 44 S.W. (2d) 245, one was injured the second day of his employment and even though he had not worked five and one-half days, consecutive or otherwise, it was held that he was a regular and not a casual employee. In general, therefore, whether one is a major employer rather than a minor employer with "more than ten employees regularly employed" is to be tested by the term "regularly employed" and the definition of "employee" in Section 3695(a). "The law (Section 3695(a)) does not provide that one may *not* be a regular employee *unless* he *has* been *actually engaged* [15] in the work for more than five and one-half consecutive work days before the accident, but that where one is *employed*, i.e., hired for a work contemplating, and is actually engaged for, more than five and one-half consecutive days, he must be considered a regular employee. From the definitions used, it would seem that a "regular" employee is one who is 'regularly employed' and must be included or counted in determining the number of employees 'regularly employed.' The word 'regular' is used in the act as an antonym of the word 'casual' and when an employee is *regular* or 'regularly employed' he is not *casual*." Barlow v. Shawnee Inv. Co., 229 Mo. A. 51, 68, 48 S.W. (2d) 35, 45.

Following Section 3692 is Section 3693 which provides that Section 3690 ("Every employer and every employee * * * shall be conclusively presumed to have elected to accept the provisions of this chapter * * *.") and Sections 3691 and 3692 shall not apply to five specified employments, the third of which is "Employments which are but casual or not incidental to the operation of the usual business of the employer." Section 3694 is another general definition—this time of "employer" and it includes *"Every person * * * corporation * * * using the service of another for pay."* Section 3695 then defines in clause (a) "employee," in clause (b) "accident," in clause (c) "personal injuries arising out of and in the course of such employment" and clause (d) does not define the word "employee"—that has already been defined in clause (a), but places a limitation upon and delimits "regular" and "casual" employee. It is the provision which transforms a "casual" employee into a "regular" employee; after "five and one-half consecutive work days" a casual employee becomes a regular employee under the act. And that is the construction that has been consistently placed upon the section. In Carrigan v. Western Radio Co., supra, it was claimed that the person who had worked but one day was a casual employee

under Section 3695 (d). But the court said, 44 S. W. (2d), 1. c. 248, "It was not the intent of the Legislature to establish a hard and fast line of distinction between a regular and a casual employee, but rather to declare that if a laborer entered the employ of an employer and pursued his duties for a period of five and one-half days, for the purposes of the chapter, he is to be considered a regular and not a casual employee. Any other construction would be contrary to reason." In McKay v. Delico Meat Products Co., 351 Mo. 876, 174 S. W. (2d) 149, it was held that a bricklayer who had worked more than five and one-half days had become a "regular" and not a "casual" employee and therefore could not maintain an action for damages against his employer. See also, McFall v. Barton-Mansfield Co., 333 Mo. 110, 61 S. W. (2d) 911, Tokash v. General Baking Company, 349 Mo. 767, 163 S. W. (2d) 554.

It so happens, from November 8, 1946 to January 16, 1947, that eleven different persons intermittently worked five and one-half consecutive days, but that fact is not determinative of whether Baalmann was a major employer. It may have been determinative of whether some specified "casual" employee had become a "regular" employee, but it is not claimed that Fowler or any other employee on the payroll was a casual employee. Between November 1 and March 11, and on March 9, there were twenty-six days on which "more than ten (regular) employees (were) regularly employed." On November 11 twelve persons were employed and thereafter there were twenty-five other occasions when eleven, twelve, thirteen and fourteen persons were employed and that is determinative of the fact that Baalmann, Inc., was a major employer under the act. Barlow v. Shawnee Inv. Co., supra; Smith v. Grace, 237 Mo. A. 91, 159 S. W. (2d) 383; 71 C. J., Secs. 127, p. 397, 179, p. 436; 58 Am. Jur., Sec. 87, p. 639. For the reasons indicated Crevisour v. Hendrix, supra, is overruled.

The Industrial Commission's finding that the activities in which Fowler was engaged at the time of his accidental death were contrary to the instructions of his employer and, therefore, the accidental death did not arise out of and in the [16] course of his employment is based on the following facts: Fowler was an instructor-pilot and Fox was a Baalmann flying student assigned to Fowler. For the night of March 11, 1947, beginning at six o'clock, the school had scheduled a cross-country, St. Louis to Kansas City and return, night flight for student Donald Fox. Fowler was assigned to accompany him on the flight. About four thirty that afternoon the weather reports indicated unsuitable flying conditions towards Kansas City and Mr. Hume, the chief of flight (and Fowler's superior) who had supervision of all flight instructors, cancelled the flight because of bad weather conditions and personally so informed Fowler. Upon Hume's order, the plane scheduled for Fowler's

flight was placed in the Robertson Aircraft Corporation's hangar, and the hangar doors closed. Fowler's superiors left and went home. Fowler remained at the company office and at six o'clock personally checked with the weather bureau as to the weather conditions and requested Mr. Tosch, Robertson Aircraft's service manager, to "roll out the plane 'Skyranger.' " Mr. Tosch, though not a Baalmann employee, said that he had orders to get any "steady flight instructor an airplane, night or day, that they ordered out." Tosch told Fowler that the flight had been cancelled. When Hume cancelled a flying order for a cross-country flight, or any flight, the employee-pilots knew they were not to fly. Only Hume and Stickel had any authority to give flying orders. Tosch asked Fowler if he (Fowler) did not know the flight had been cancelled and Fowler said that he did. Fowler was not only not authorized to make the flight to Kansas City, or to take the plane out at all, but this particular flight to Kansas City was cancelled and forbidden by his employer. After Tosch had rolled the plane out Fowler and Fox took off at 6:30 P. M.

It was a school regulation and a Civil Aeronautics Board regulation that the pilot-instructor (Fowler) file flight plans with the local weather bureau before leaving the airfield on a cross-country flight. Fowler did not do so. Nor did he file a flight plan at Kansas City. On the way to Kansas City Fowler stopped at Columbia and charged gasoline to the account of his employer. He also charged gasoline at Kansas City. It does not appear in the record before us that Baalmann paid therefor. Fowler and Fox took off from the airport at Kansas City between 11 and 11:30 P. M., "in spite of a hard rain." "They were advised by the control tower (at Kansas City) not to leave but they left anyway." About 11:30 P. M. the plane crashed near Atherton, Missouri, just east of Kansas City. At the time and scene of the crash it was a bad night and raining very hard. Fowler's employer did not know until the next morning that its direct order had been violated and that the cancelled flight had been attempted.

Under the above stated facts and circumstances it is contended that the Commission's finding that Fowler did not die as the result of an accident arising out of and in the course of his employment is supported by competent and substantial evidence. It is said Fowler was not at a place where his duties required him to be but was at a place where he was forbidden to go, that he was not performing an assigned task but was doing a thing in direct violation of his employer's orders, and that therefore his death did not arise out of and in the course of his employment. The question for determination, tersely stated, is whether an accident arises out of and in the course of employment, if it occurs when the employee is in a place where he is, by the direct order of his employer, prohibited from going, and when he is doing an act which he has, by the direct order of his employer, been prohibited from doing.

Claimants had the burden of establishing that the death of Fowler arose out of and in the course of his employment. The Industrial Commission found that it did not so result. "It has been said that an injury 'arises "out of" the employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury; and that an injury to an employee arises "in the [17] course of" his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incidental thereto.' " Goetz v. J. D. Carson Co., 357 Mo. 125, 206 S. W. (2d) 530.

Appellants rely upon R. S. Mo. 1939, Sec. 3691, which, in part, provides, that, "Where the injury is caused by the willful failure of the employee to use safety devices where provided by the employer, or from the employee's failure to obey any reasonable rule adopted by the employer for the safety of the employees", that the compensation recoverable shall be reduced by fifteen percent, etc. But these facts do not present an instance of the failure of Fowler to obey any reasonable rule adopted by Baalmann. Instances of the violations of such rules as are contemplated by Sec. 3691, are exemplified by such cases as Brown v. Weber Implement & Auto Co., 357 Mo. 1, 206 S. W. (2d) 350, 355, Scharlott v. New Empire Bottling Co., 354 Mo. 971, 192 S. W. (2d) 853, Triola v. Western Union Telegraph Co., 224 Mo. App. 258, 25 S. W. (2d) 518.

Nor do these facts present an instance where an employee was doing a thing he was employed to do, but was doing it in a manner prohibited by his employer, such as, an employee whose duty it was to oil certain machinery, but who (contrary to his employer's direct and affirmative orders) oiled the machinery while it was in motion. Mere disobedience of an order as to the *detail* of the work in hand or the mere breach of a rule as to the *manner* of performing the work are not generally sufficient to deprive an employee of his right to compensation so long as he does not go out of the sphere of his employment. But compensation cannot be allowed when the employee goes outside of the sphere and scope of his employment and is injured in connection with an activity he has been expressly forbidden to undertake.

In Honnold on Workmen's Compensation, Vol. 1, § 113, it is said: "There are prohibitions which limit the sphere of employment, and prohibitions which deal only with conduct within such sphere. A transgression of a prohibition of the latter class leaves the sphere of employment where it was, and consequently will not prevent recovery of compensation. A transgression of the former class carries with it the result that a man has gone outside the sphere." Schneider's Workmen's Compensation Text, Vol. 6, § 1581, states that rule in these words: "But where, however, the rule (order or pro-

hibition) is one limiting the scope, ambit, or sphere of work which the employee is authorized to do, such a violation forecloses the compensability of an injury so sustained." An employer has the unqualified right to limit the scope of a servant's employment and activity and to determine *what* an employee shall or shall not do. The employer likewise has the unqualified right to determine *when* an employee shall do a certain thing. Kaspar v. Liberty Foundry Co., (Mo. App.) 54 S. W. (2d) 1002, 1005. The employer may terminate an employment. The prohibition which the employer laid down in this case (the direct order expressly cancelling the flight) goes deeper into the relationship of the parties than any mere rule, for it severed utterly and terminated completely the employer-employee relationship for the day. After the order was given and the flight cancelled, in the subsequent act of taking the plane and Fox and going on the cross-country trip to Kansas City and return, Fowler was not an employee of Baalmann. That relationship had ended for the day. When the accident occurred Fowler was in a place where he was prohibited from being by the positive order of Baalmann because of the danger involved. In that place Fowler was doing a thing he was prohibited from doing by the positive order of Baalmann. Fowler's presence at the place of his death was in direct disobedience of express orders. His death was due directly to his disregard of those express orders. In going to the place where he lost his life, he did not go as an employee of Baalmann.

[18] Under these circumstances Fowler was engaged in a purely voluntary act, not only forbidden by Baalmann but unknown to and unaccepted by Baalmann, and it cannot be held that his death arose out of and in the course of any employment. Smith v. Seaman & Schuske Metal Works Co., 344 Mo. 559, 127 S. W. (2d) 435, Lynch v. Tobin Quarries, (Mo. App.) 148 S. W. (2d) 80, Staten v. Long-Turner Const. Co., (Mo. App.) 185 S. W. (2d) 375, Gacesa v. Consumers Power Co., (Mich.) 190 N. W. 279, 24 A. L. R. 675, Thomas v. Industrial Commission, 54 Ariz. 420, 96 Pac. (2d) 407, In re Fournier's Case, 120 Me. 236, 113 Atl. 270, 23 A. L. R. 1156, Hibberd v. Hughey, (Neb.) 194 N. W. 859, Jones v. Sloss-Sheffield Steel & Iron Co., (Ala.) 130 Sou. 74, Rautio v. International Harvester Co., (Minn.) 231 N. W. 214, Pacific Employers' Ins. Co. v. Industrial Accident Commission, (Cal.) 43 Pac. (2d) 818, Waldbauer v. Michigan Bean Co., (Mich.) 270 N. W. 285, Anderson v. Russell Miller Milling Co., (Minn.) 267 N. W. 501, Consolidated Coal Co. v. Ratliff, 217 Ky. 103, 288 S. W. 1057, Kuzmick v. Hudson Coal Co., (Pa.) 4 Atl. (2d) 453, Goodyear Aircraft Corp. v. Gilbert, 65 Ariz. 379, 181 Pac. (2d) 624, Smith v. Corson, 87 N. J. Law 118, 93 Atl. 112, State Treasurer v. Ulysses Apts. Inc., et al., 250 N. Y. Supp. 190, Sheboyan Airways v. Industrial Commission, 209 Wis.

352, 245 N. W. 178. See also Annotations 23 A. L. R. 1161, 83 A. L. R. 1211, 19 A. L. R. 1409.

The instant case is readily distinguishable from Linam v. Murphy, 360 Mo. 937, 232 S. W. (2d) 937, wherein Cooke the flying instructor, was ordered by his employer to take his ''G. I.'' student Linam ''out for some dual instruction.'' In the instant case the trip was cancelled and the employment terminated for the day. In the Linam case the trip was ordered by the employer and immediately begun, and the flying instructor was clearly within the scope of his employment.

In this case the fact that Fowler ''was accidentally killed while doing the very thing he was employed to—instruct a student flyer by taking him on a previously scheduled cross-country night flight''—is not determinative, for here, only two hours before, the flight in question had been specifically cancelled and expressly forbidden and Fowler's employment had been terminated for the day. Clearly, the Commission's finding that Fowler did not die as the result of an accident arising out of and in the course of his employment is supported by competent and substantial evidence. The judgment of the circuit court affirming the award of the Industrial Commission is affirmed. It is so ordered. All concur.