256 S.W.2d 805 (1953)
OSSERY
v.
BURGER-BAIRD ENGRAVING CO. et al.
No. 43148.
Supreme Court of Missouri, Division No. 2.
April 13, 1953.
*806 John G. Brannon, Ward A. Dorsey, Stephen R. Pratt, North Kansas City, for appellant.
Don M. Jackson, Kansas City, for respondents. Gage, Hillix, Moore & Park, Kansas City, of counsel.
BOHLING, Commissioner.
Mabel R. Ossery, widow and sole dependent, prosecutes this appeal from a judgment of the circuit court affirming an award of no compensation under the Workmen's Compensation Law by the Industrial Commission of the State of Missouri for the death of Samuel C. Ossery, her husband, an employee of Burger-Baird Engraving Company, a corporation. Claimant contends she proved the death of her husband was the result of an accident arising out of and in the course of his employment, and that the final award of the commission to the contrary (reversing an award by the referee of $150 for burial expenses and $12,000 for death benefit), and the judgment of the circuit court affirming said final award are erroneous because there *807 was no competent and substantial evidence upon which to base the award. We have jurisdiction by reason of the amount involved. Section 287.240 RSMo 1949, V.A. M.S.; Shroyer v. Missouri Livestock Comm. Co., 332 Mo. 1219, 61 S.W.2d 713, 715[9-12]; Sayles v. Kansas City Structural Steel Co., 344 Mo. 756, 128 S.W.2d 1046, 1050[1].
The Burger-Baird Engraving Company occupied space in the Graphic Arts building on the northwest corner of Tenth and Wyandotte streets, Kansas City, Missouri. Its lease covered all rooms on the seventh floor (sic: "Rooms All on seventh floor") and the northwest wing and room 803 on the eighth floor.
On March 1, 1950, Mr. Ossery reported for work at 8:30 a. m. at the Burger-Baird Engraving Company and met instantaneous death about 9:30 when his body struck the pavement under an open window of the elevator lobby on the seventh floor.
Four or more tenants occupied the eighth floor of the Graphic Arts building. The elevator service for the building stopped at the seventh floor, and the tenants on the eighth floor had to use the stairway. The elevator lobby, or hall, is near the center of the building on the east side. The elevator is about six feet from the east wall and on the north side of the lobby. The space between the wall and the elevator is a passageway north to the employees' entrance of the employer. The stairways, leading up and down, are located on the south side of the lobby. The entrance to the employer's offices is at the southwest corner of the lobby. The employer occupies rooms to the south, west and north of the elevator lobby, and doors and corridors within this space afford access to various departments of the employer. The lobby has three windows on the east side, the bottom of the window sills being 27 inches above the floor level. The window to the north has a radiator in front of it and the one to the south is over the stairway leading down and 44 inches above the stair landing. The center window is the easiest "to go out of."
Donald Byrd, who at that time made deliveries for the employer, was in the elevator lobby waiting for the elevator at approximately 9:30. He saw Mr. Ossery come out of the doorway at the employees' entrance. He asked him how he was feeling. Mr. Ossery made a reply but witness did not understand his answer as the elevator was approaching and making a noise. When he boarded the elevator, Mr. Ossery was going back into the shop. Mr. Ossery had on his overalls. He appeared normal. He was walking normally and witness did not notice a cane or see him lean on anything. All windows in the lobby were closed at that time. The weather was below freezing but it was warm in the lobby. When the elevator arrived at the first floor, less than two minutes later, a boy came up and said a man was lying out there. He looked. He then went back upstairs and found the center window of the lobby open.
Ben F. Seward, president of Burger-Baird Engraving Company, was claimant's witness. He was the only witness on the scope of Mr. Ossery's employment. He testified as follows: Mr. Ossery had worked for the company for 20 to 25 years. He was a photo-engraving finisher. He worked at a table, facing the light, on the north side of the building in the proofing department. (This was approximately 60 or more feet from the employees' entrance.) His duties required him to examine the face of the engraving plates for defects, to make corrections, and put the final touches on the plates by hand tools. He was a highly skilled man, paid by the hour, and earned $100 a week. Being paid by the hour, the employer had rules and the accepted practice was for the finishers to stay on the job during working hours, and for the apprentices to run the errands of the finishers. A finisher might have occasion to go into the woodworking department on the east side of the building and into which the employees' entrance opened. Nothing about his work required Mr. Ossery to leave the shop or premises or go into the hall during working hours. If he went into the hall during working hours, he left his job and business, because it is a public hallway and no part of the company's property. Asked by claimant's counsel whether "Mr. Ossery under no circumstances could have gone into *808 this seventh floor hallway on some matters that might be incidental to his employment," the witness answered: "I have the word of the superintendent that he hadn't sent him out there, or anybody else"; and pressed for his personal knowledge whether in the general course of his employment Mr. Ossery would have occasion to go into the hallway, he answered: "Never, to my knowledge." Witness was out of the state at the time of Mr. Ossery's death. One could go from the north to the south rooms of the employer by way of the elevator lobby; but the employees wore work clothes and to the witness' knowledge never used the lobby but used the corridors and doors within the rooms for that purpose. The owner of the building placed an iron bar across the center window of the lobby after Mr. Ossery's death. It is the only window with a bar across it. There is no bar across any window on the leased premises.
Mrs. Ossery testified that her husband had been but was not on March 1, 1950, under the treatment of a physician; that he injured his knee in October, 1949, wore a kneeband, and used a cane; the physician gave him phenobarbital tablets and, as we read the record, on a Sunday about two weeks before his death Mr. Ossery did not awaken until late Sunday night; that on the Saturday and Sunday prior to his death Mr. Ossery's "knee wobbled on him" when he got up and he picked up his cane to go to the bathroom, and that he had a dizzy spell while waiting for a ride to work on the day of his death.
Mr. Seward testified that for some time Mr. Ossery had been sick, discouraged and despondent.
Additional facts are stated in the course of the opinion.
The parties direct our attention to the frequently quoted passage from Wahlig v. Krenning-Schlapp Groc. Co., 325 Mo. 677, 29 S.W.2d 128, 130[1, 2], that under now sections 287.120(1) and 287.020(5), RSMo 1949: "* * * an injury arises `out of the employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury; and that an injury to an employee arises `in the course of his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incidental thereto." Karch v. Empire Dist. El. Co., 358 Mo. 1062, 218 S.W.2d 765, 770[6] citing cases.
The findings, rulings and award of the referee, Section 287.460 RSMo 1949, V.A.M.S., as well as the final award of the commission, § 287.480, are among the factors to be considered upon judicial review, § 287.490, in determining whether the final award of the commission is supported by substantial evidence upon the whole record. Michler v. Krey Pkg. Co., Mo.Sup., 253 S. W.2d 136, 140, stating: "It is the award of the Commission that is reviewed by the Courts and not the award of the referee." Consult Douglas v. St. Joseph Lead Co., Mo.App., 231 S.W.2d 258, 261[3, 4]; Diebold v. Great Atl. & Pac. Tea Co., Mo.App., 241 S.W.2d 31, 33[2, 3]. Awards of the commission are set aside only when clearly contrary to the overwhelming weight of the evidence. Courts do not substitute their judgment for that of the commission when supported by competent and substantial evidence upon the whole record. Michler v. Krey Pkg. Co., Mo., 253 S.W.2d 136, 141 [6]; Karch v. Empire Dist. El. Co., 358 Mo. 1062, 218 S.W.2d 765, 769[3]; Scott v. Wheelock Bros. Inc., 357 Mo. 480, 209 S.W.2d 149, 151[3, 4].
From the evidence that Mr. Ossery had an injured knee, which gave way under the pressure of his body, wore a kneeband, used a cane, and had a dizzy spell before leaving for work on the morning of his death, claimant contends the inference may be drawn that he became ill at work, went to the window in the elevator lobby for air, especially if he felt faint or dizzy, to avoid disturbing his fellow workers, and a case was made on circumstantial evidence, which is aided by the presumption that an accident arises out of and in the course of the employment when an employee is found dead at a place where his duties require him to be. Zimmerman v. Goodfellow Lumber Co., Mo.App., 56 S.W.2d 608, 611[3-6]; McCoy v. Simpson, 346 Mo. 72, 139 *809 S.W.2d 950, 952[3]. The presumption is a rebuttable one, Stamps v. Century El. Co., Mo.App., 225 S.W.2d 493, 496[1-4], and the liberal application of the law does not extend to the authorization of a claim lacking some essential element required by the law. Mershon v. Missouri Pub. Serv. Corp., 359 Mo. 257, 221 S.W.2d 165, 167[1].
The printed portion of the employer's lease provides that the owner is to furnish janitor service for all public parts of the building, such as elevator lobbies used by the tenants in common. A typewritten clause provides that the employer "janitor the passenger elevator lobby on the seventh floor." The lease had attached thereto as an exhibit a "floor plan," apparently common to all floors of the building, and written thereon is "All of 7th floor." The lease contains the typewritten provision that: "Should the lessor at any time during the time of this lease decide to install the second passenger elevator, the lessee agrees to vacate that part of the passenger elevator lobby occupied by it." Claimant argues that these covenants establish that the employer had possession of the elevator lobby. Reading the lease as a whole and the floor plan, we think the above provisions are not to be given so broad a construction. Another exhibit, a more detailed blueprint of the seventh floor, dated November 18, 1950, discloses that the available space in the elevator lobby for the second elevator was immediately west of the existing passenger elevator. The lease was of all "rooms" on the seventh floor, and the employer was not to "obstruct or use, otherwise than for passage," so far as here involved, the lobby on the seventh floor. At least four other tenants occupied space on the eighth floor. As the elevator went only to the seventh floor, it was necessary for the owner to control this lobby for the accommodation of the tenants on the eighth floor. However, the space immediately west of the existing elevator and available for the second elevator should the owner decide to use the space for that purpose was so located as to serve no useful purpose of the eighth floor tenants and their patrons. The reasonable construction of the provisions written in the lease is that the parties contemplated the employer-lessee, if it so desired, might use the space reserved but not used for a second elevator until such time as the owner decided to install the second elevator for the accommodation of the tenants, and in connection therewith was to furnish the janitor service for the lobby. The owner did not demise to the employer any portion of the elevator lobby used as a passageway for the tenants of the building, which embraced the portion of the lobby involved in the instant proceeding. This construction is in harmony with the actions of the lessor and lessee under the lease. Mr. Seward testified that the owner and not the employer-lessee had control of the elevator lobby with the exception of the janitor service. There is no testimony of record in conflict therewith.
Employer's president, Mr. Seward, was a competent witness on the duties of Mr. Ossery. He was claimant's witness, and the only witness on the scope of Mr. Ossery's employment. He testified there was nothing about Mr. Ossery's work that required him to go into the lobby during working hours. The "finishers" were required to stay on the job. The employer would not discharge an employee for walking into the lobby. While it would not be a violation of any rule for a finisher to walk across the lobby in going to the clerical workers' side of the building, he also testified that the employees just do not go into the lobby; "We have no written law, because they don't." Claimant's counsel developed that in the general course of Mr. Ossery's employment he would have no occasion to go into the hall on some matter incidental to his employment. We find no substantial evidence that Mr. Ossery was proceeding to the offices of his employer or that he was on some mission connected with his work.
There is, as claimant states, no affirmative evidence as to the reason Mr. Ossery went to the window. Nor is their circumstantial evidence of the probative force of that found in the claimant's case of Zimmerman v. Goodfellow Lumber Co., supra (a case wherein an award of compensation was affirmed), to sustain claimant's position. Mr. Ossery was seen in the hall less than *810 two minutes before his death. The window was then closed. He appeared normal at the time. He walked normally. He had no cane and there is no testimony of a cane being in the hall or on the pavement. He raised the window high enough to pass through without damaging it so far as disclosed of record.
Findings that the evidence did not establish a causal connection between the conditions under which Mr. Ossery was required to work and his death, and did not establish that his death was sustained while he was reasonably fulfilling the duties of his employment or while he was engaged in doing something incidental thereto is not clearly contrary to the overwhelming weight of the evidence. The award of the commission was for the right party upon the whole record. Donzelot v. Park Drug Co., Mo.App., 239 S.W.2d 526, 529[2]; Fowler v. Baalmann, 361 Mo. 204, 234 S.W. 2d 11, 17[10-12]; Mershon v. Missouri Pub. Serv. Corp., supra; Stamps v. Century El. Co., supra; Wahlig v. Krenning-Schlapp Groc. Co., supra.
The judgment is affirmed.
WESTHUES and BARRETT, CC., concur.
PER CURIAM.
The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.
All concur.