Sarah Pauline **CONLEY** (Dependent), Claimant, Respondent,

v.

Kenneth V. **MEYERS**, d/b/a Meyers Pontiac Company, Employer, and Hawkeye-Security Insurance Company, Insurer, Appellants.

No. 45993.

Supreme Court of Missouri, Division No. 1.

July 8, 1957.

of Clay County affirming an award of the Industrial Commission for $12,000 death benefits and $400 burial expenses to the widow and sole dependent of Jewel Edwin Conley, deceased.

Section 287.240(2) RSMo 1949 of the Missouri Workmen's Compensation Law, as amended Laws 1953, p. 530, V.A. M.S., provides for "a single total death benefit" payable in weekly installments and, since the award here exceeds $7,500 exclusive of costs, it is immaterial that the statute further provides that "on the death or remarriage of a widow, the death benefit shall cease unless there be other total dependents entitled to any unpaid remainder of such death benefit." In this case there are no other dependents, but this court has jurisdiction of the appeal on the ground that the amount in dispute exceeds $7,500. Article V, Section 3, Constitution of Missouri 1945, V.A.M.S. Ossery v. Burger-Baird Engraving Co., Mo.Sup., 256 S.W.2d 805, 807; Sayles v. Kansas City Structural Steel Co., 344 Mo. 756, 128 S.W. 2d 1046, 1050(1); Shroyer v. Missouri Livestock Comm. Co., 332 Mo. 1219, 61 S.W.2d 713, 715(9–12). Appellants' motion to transfer the cause to the Kansas City Court of Appeals is overruled.

In reviewing a Workmen's Compensation case we have the duty of determining whether the Commission's award is supported by competent and substantial evidence upon the whole record. Art. V, Sec. 22, Constitution of Missouri 1945. This does not mean that we may substitute our own judgment on the evidence for that of the Commission, however, we are authorized to decide whether the Commission could have reasonably made its findings and reached its result, upon a consideration of all of the evidence before it, and to set aside its decision if clearly contrary to the overwhelming weight of the evidence. Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647; Foster v. Aines Farm Dairy Co., Mo.Sup., 263 S.W.2d 421, 423.

Richard P. Sprinkle, Sprinkle, Knowles & Carter, Kansas City, for appellants.

Walter R. James, R. Kenneth Elliott, North Kansas City, for respondent.

DALTON, Justice.

This is an appeal by the employer and insurer from a judgment of the Circuit Court

■ The Industrial Commission, as a basis for its award, found that, on December 14, 1954, the deceased was an employee of Kenneth V. Meyers, d/b/a Meyers Pontiac Company; that he was working under the provisions of the Missouri Workmen's Compensation Law; and that, on said date, he sustained an accident in Clay County arising out of and in the course of his employment with said employer, "causing injuries to his body which aggravated the aneurism that he had at the time of the accident and thereby causing said aneurism to increase in size and thereby hastening his eventual death, which occurred on April 27, 1955."

Appellants contend (1) that the Industrial Commission erred in finding that the deceased employee sustained an accident on December 14, 1954, arising out of and in the course of his employment; and (2) that the Industrial Commission erred in finding that the deceased employee died on April 27, 1955, "as the result of a ruptured aortic aneurism, and that his death was hastened as the result of injuries sustained in an automobile accident on December 14, 1954."

A review of the evidence applicable to the issues is required. As to the first, no question is presented concerning the fact of employment or the occurrence of an accident. Appellants, however, contend that there was no showing that Conley, at the time of the accident, was in the course of his employment, that is, that he was on business for his employer. Appellants insist that the employee was on a personal errand for his own purposes at the time of the accident.

Conley was employed as an automobile salesman for new and used automobiles at a place of business referred to as a sales lot at the City of Riverside, in Clay County. The lot was known as the Motor Mart. It was located at the intersection of Highways Nos. 69 and 71. The business conducted there was an integral part of the employer's business in Platte City, some 15 miles to the north on Highway 69. Conley and his wife lived on the Motor Mart premises. "He just sold cars just like any salesman would." He traveled off the lot many times and "sold cars any time he could." "He stayed open at the lot mostly until 9:00 o'clock in the evening." He would take a car to the home of anybody interested in buying it.

On the evening in question, December 14, 1954, about 7:30 p.m., Conley's employer sent him from Riverside to Platte City to get a new 1955 Pontiac Sedan "to show to some people that had previously been in the lot looking for a car of that type." He was told to take the car and "go to Linden, where these people had described where they lived, and see them." They lived "some place over there around Linden." Linden is a community on Highway 169 in Clay County and is within the corporate limits of the City of Gladstone. In traveling from Platte City to Linden, the employer testified that one would ordinarily go to Nashua on 71 by-pass and then south on Highway 169 to Linden; that he had gone that way many times; and that that would also be the general route used by people of the employer's acquaintance, "that's the way they would go."

■ About 8:40 p.m., the same evening, December 14, 1954, as Conley was driving south in the southbound lane of Highway 169 in Clay County, he drove his automobile into the rear of an automobile stopped on the highway. The parked automobile was driven down the highway some 75 feet beyond the point of collision. There were skid marks on Highway 169 for 153 feet north from a point 10 feet north of the point of impact. Both automobiles were extensively damaged, including the front end and left side of the Pontiac Sedan and its steering wheel was bent. The collision occurred on the west side of Highway 169 at the north edge of the Shady Lane Drive intersection and within the City of Gladstone. While Linden was one mile north of the scene of the collision, both were

within the City of Gladstone. Conley was taken by ambulance to Research Hospital and seven stitches were taken to sew up a cut on his right forehead. There was no testimony tending to show exactly where the parties lived that were interested in buying the Pontiac and there was no other testimony tending to show what work Conley was doing at the time of the accident, or concerning his purpose in being where he was when the collision occurred. Claimant proceeds upon the theory that Conley was either seeking the prospective purchaser, or that he was proceeding back to his place of business to close the Motor Mart at 9:00 p.m. Appellants construe the claimant's evidence concerning the direction of travel and the location of the accident as showing that Conley was proceeding toward North Kansas City on a mission of his own. Appellants also rely on the oral testimony of one Hyler, a claim adjuster, to the effect that he interviewed Conley after the accident and Conley told him "he was going to North Kansas City to buy his wife a Christmas present" at the time he was injured. Reliance is put also on evidence tending to show that Conley had been drinking and was driving at high speed. The member of the Highway Patrol who interviewed Conley at the scene of the accident had detected the odor of alcohol. It is argued that, in view of the speed at which Conley was driving, he had no intention of stopping in the immediate vicinity of Linden or in contacting any prospective buyer. Appellants also say that the lapsed time from 7:30 to 8:40 p.m., easily discredits the theory that Conley was still seeking the prospective customer after the trip to Platte City and back to Linden. All of these matters were for the consideration of the Commission in determining the facts. There is no "conclusive evidence of deviation," although appellants present a rather extended jury argument to that effect. It is sufficient to say that the triers of the fact did not accept appellants' theory as true nor find the facts in accordance therewith. The credibility, weight and value of Hyler's oral testimony concerning the alleged statement by the deceased was for the triers of the fact. The Commission could believe or reject, in whole or in part, the testimony of the witness, whether contradicted or not; and they could draw such inferences as they deemed proper from the other evidence. Dempsey v. Horton, 337 Mo. 379, 84 S.W.2d 621, 624 (4).

■ Finally, appellants say "the record in this case is searched in vain for any evidence indicating that, at the time of the accident, the employee was on business for his employer." With that statement we cannot agree. The phrase "in the course of" employment is a test in reference to time, place and activity to determine if there is any work connection between the employment and the accident. Where such connection appears, a finding that the accident occurred in the course of employment will be sustained. See Spradling v. International Shoe Co., 364 Mo. 938, 270 S.W.2d 28. The rule is stated in Wahlig v. Krenning-Schlapp Grocer Co., 325 Mo. 677, 29 S.W.2d 128, 130 (1, 2), as follows: "It has been quite uniformly held that an injury arises 'out of' the employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury; and that an injury to an employee arises 'in the course of' his employment when it occurs within the period of his employment, at a place where he may reasonably be, and while he is reasonably fulfilling the duties of his employment or engaged in doing something incidental thereto." And see Spradling v. International Shoe Co., supra.

As stated, Conley was an automobile salesman without limitations as to hours or premises and had full authority to exercise discretion in operating automobiles on the highway in connection with the business in which he was employed. The 1955 Pontiac Sedan wrecked in the collision belonged to Conley's employer. It was the one he had been sent to Platte City to get. He was to drive it down from Platte City

and show it to a prospect near Linden, a community in the City of Gladstone. The specific address of the prospect does not appear. Conley was in the City of Gladstone when the accident happened. Approximately one hour and ten minutes had elapsed since he left Riverside, at his employer's direction for Platte City, 15 miles away. He had gone from Riverside to Platte City, he had obtained the automobile, as directed, and he was operating the automobile within the city limits of Gladstone when the accident happened. Whether he had seen his prospect does not appear. We think it immaterial whether he had done so or not, since he was still in the immediate vicinity where the employer had directed him to go. He had discretion to select the route he should travel. Further, the place of accident could well have been on the direct route to the prospect's home or between the prospect's home and Conley's employer's place of business at Riverside. The point of the accident was north of the place Conley would have turned off to return to Riverside, his place of employment. In view of these facts the Commission's finding on this issue is supported by competent and substantial evidence and it is not against the overwhelming weight of the evidence.

As to the second issue presented, to wit, that the Commission "erred in finding that the deceased employee died on April 27, 1955, as the result of a ruptured aortic aneurism, and that his death was hastened as the result of injuries sustained in an automobile accident on December 14, 1954." Appellants' theory is that "there could be no causal connection between the deceased employee's accident on December 14, 1954 and his subsequent death on April 27, 1955"; and that there is no substantial evidence in the record to support a finding for claimant.

The death certificate offered in evidence showed Conley's death on April 27, 1955, and that the condition directly leading to

death was "Rupture of Aorta Aneurism"; that the interval between onset and death was 2-3 seconds; and that the antecedent cause was "Aortic Aneurism, 2 years." There was no autopsy. The employer and insurer offered the records of Bethany Clinic where Conley died on April 27, 1955. The records showed final diagnosis "Ruptured Anuresym." The progress record showed: "Aorta Anuerism in acute respiratory difficulty under care of Dr. Mayer in K.C. who had performed surgery. Progressively more trouble with eventual closure of main bronchus and death by asphysia. Certificate Rupture of Aneurysm." There was no directly contradictory evidence. The clinic records further show that Conley continued to have difficulty in breathing until the time of his death. The death certificate and these records were sufficient substantial evidence as to the cause of death, regardless of the fact that no autopsy was performed. Kimmie v. Terminal R. Ass'n of St. Louis, 334 Mo. 596, 66 S.W.2d 561, 564; Goodwin v. Kansas City Life Ins. Co., Mo.App., 279 S.W. 2d 542, 543, (10: Hendricks v. National Life & Accident Ins. Co., 240 Mo.App. 557, 210 S.W.2d 706, 709; Frank v. Atlanta Life Ins. Co., Mo.App., 211 S.W.2d 940, 942. As indicated above, the Commission made no finding that the employee died "as the result of a ruptured aortic aneurism."

The aorta is the main blood vessel coming from the right chamber of the heart. It describes an arc and descends down along the vertebral column and sends branches to supply the body. An aortic aneurism is a bulging of this vessel at some place, due to a thinning of the walls, so that it expands and is filled with blood under pressure, and it forms a large saccular structure, which causes pressure on various organs. In 1954, prior to the accident in question, Conley had told his physician of having such an aneurism for some eleven years; and that, when it was first discovered, he was given only about six months to live. He did not want anyone to

stir it up or make an issue of it and said: "This is how it is; I am able to carry on my work; I feel good; leave me alone."

As bearing upon his physical condition at and prior to the date of the accident, the evidence shows that Conley received an advance of $75 per week from his employer, applicable against commissions on sales during the particular month; and that his earnings were in excess of $60 per week. His employer stated that, if he hadn't earned in excess of that amount, he "would have been wanting to get rid of him." Prior to the accident his employer did not know of any disability, or "that anything was wrong with him." His employer didn't know anything about any heart condition until after the accident, although Conley had been employed for more than a year. Conley had "never hardly missed a day's work" and his physical condition was very good. He was never "sick up until the accident." He was full of energy and never quiet. While he had a heart condition, "it never had bothered him in any way." He was able to carry on his work very satisfactorily.

The evidence further shows that, when Conley drove the 1955 Pontiac Sedan into the back of the automobile parked on the highway, he sustained certain physical injuries, including a cut on his right forehead, requiring some seven stitches. The force of the collision is indicated by the extent of the damage to the automobiles. The steering wheel of the Pontiac was bent and the total damage amounted to approximately $500. The other automobile, struck in the rear, came to rest 75 feet beyond the point of impact. Such was the force of the impact. Conley was sent to a hospital in an ambulance. He returned to his home sometime during the night, but his chest was bruised and he had lots of pain through his chest. He was unable to sleep and "walked the floor with it that night—practically all night long." While he returned to work the next day, yet within a few days, he was "stooped over when he walked and he would just not be able to sit up." He

could not eat. He started getting worse from that day. Every day he got worse. He became more stooped every day and lost weight. He started losing his voice. "He was very short of breath and it seemed to hurt him to breathe, and he held his head on one side." He became very sallow in color. By January 5, 1955, "you could hardly hear him speak. * * * It was a very hoarse whisper." He was suffering to such an extent that he decided to go to the hospital. He had continued to try to work up until he went to the hospital. He had gone to see his regular physician within a day or so after the accident and "he went back after he kept getting worse." On the 5th of January, 1955, he entered Research Hospital and was operated on, and he never did get any better. He pulled through the surgery all right, "but his voice never returned, and he never had any strength and he was losing weight all the time." He left the hospital about February 16, 1955. He didn't return to work after leaving the hospital. He didn't go anyplace. He stayed home most of the time. Just sat around, but did visit his mother and went fishing. His voice was "a very hoarse whisper." His physical condition got steadily worse. He had great difficulty breathing and went to the Hospital at Bethany and died April 27, 1955.

Dr. Ethlyn Jennings saw Conley on December 16, 1954, and examined him. His main complaint, at that time, was severe chest pain. He gave a history of a car accident in which he had struck his chest very forcibly against the steering wheel. He was slightly short of breath, but he had a good voice. When he had been treated before, although the aneurism was observed by fluoroscope, there was no complaint of pain or shortness of breath. On December 26, 1954, the "chest pain that he complained of was severe. His shortness of breath was much worse. He was acquiring a rather bluish or purplish color to his face, and he was becoming quite hoarse. He was having great difficulty making himself heard, and the effort of making himself heard

made him very short of breath." The physician believed that "the aneurism had become much worse and was putting pressure on his windpipe and on the nerve that comes from the spinal ganglion along side the aorta supplying the voice box."

Prior to December 14, 1954, Conley "had no difficulty in carrying on his business; he had no shortness of breath; he had no bluish color to his face; he had no hoarseness." He "was safe so long as no new force" was exerted. His physician said that something must have happened to the aneurism increasing it in size in order to produce the severe pressure on his windpipe and increase the difficulty in breathing that she observed after the accident on December 14. Dr. Jennings, who saw him decline after December 14, 1954, gave it as her opinion that the accident of December 14, accelerated or hastened the rupture of the aortic aneurism.

With reference to Conley's operation in January 1955, the evidence shows that in the latter part of December 1954, Conley was referred to Dr. John Henry Mayer and an operation was performed in an attempt to relieve the pressure against Conley's windpipe and against the recurrent laryngeal nerve. The aneurism was larger than anticipated, approximately nine inches across, and one area was extremely thin. Its condition was such that little remedial action could be taken, except to inject a sclerosing substance in an effort to prevent a further increase in size. In answer to a hypothetical question reviewing certain evidence Dr. Mayer gave it as his opinion that the mentioned accident aggravated the aneurism, causing it to increase in size and produce Conley's symptoms and hastened his death.

It is apparent, we believe, that the evidence hereinbefore reviewed was competent and substantial and tended to support the Commission's finding that Conley sustained an accident on December 14, 1954 "causing injuries to his body which aggravated the aneurism that he had at the time of the accident and thereby causing said aneurism to increase in size and thereby hastening his eventual death, which occurred on April 27, 1955."

Appellants, however, rely on the following evidence: Dr. Kuenzi, a physician who was passing the scene of the accident, administered first aid to Conley, but he observed no injuries other than to Conley's head and Conley made no complaint to him about chest pains or other injuries. Conley made no complaint about any chest injuries at the time the State Highway Patrol trooper investigated the accident. The hospital records made immediately after the accident show only "head injuries from auto accident"; and that Conley "refused to be admitted" and went "out per wh. chair and yellow cab." The records of Research Hospital, when Conley entered for the operation in January 1955 show, concerning personal history, that Conley complained of "persistent generalized chest pain and dyspnea of 11 yr duration. * * * 45 yrs old male admitted * * * the chief complaint of persistent generalized chest pain since 1943 about 11 yrs ago which started suddenly not accompanied by fever or cough or loss of weight. * * * Has had a history of car accident causing laceration of knee, legs and head."

When Dr. Mayer reported to Dr. Jennings, on March 22, 1955, after the operation on Conley, Dr. Mayer said: "Whether the injury had anything to do with the progressive nature of the patient's symptoms, cannot actually be substantiated nor discredited by the findings at surgery." Appellants rely on the above evidence and particularly the recitals in the hospital records as removing "all proximate cause between the accident and Conley's subsequent death," and argue that the first report of the aggravation of the aneurism by the accident appeared at the trial. Appellants further take the position that these hearsay statements noted in the hospital records are binding on the widow in this proceeding, as

if the statements therein were her own sworn testimony. Appellants cite Mollman v. St. Louis Public Service Co., Mo.App., 192 S.W.2d 618, 621; and Smith v. Siercks, Mo.Sup., 277 S.W.2d 521, 525, which of course have no application here. Appellants argue at length as to the weight and value of the information set forth in the hospital records, but the weight and value of the evidence was for the trier of the fact. Clearly the hospital records were not conclusive concerning Conley's prior condition of health. The facts purportedly shown by these records could be contradicted by the oral testimony of lay witnesses and such testimony constitutes substantial evidence. See Wright v. John Hancock Mutual Life Ins. Co., Mo.App., 153 S.W.2d 747, 749; Allen v. American Life & Accident Co., Mo.App., 119 S.W.2d 450, 453.

Appellants further argue that only the death certificate supports the claim that Conley died as the result of rupture of an aortic aneurism; and that the death certificate is only prima facie evidence of the facts stated therein (Sec. 193.170 RSMo 1949, V.A.M.S.). They further argue that, since there was no autopsy, the statement in the death certificate as to cause of death is only a conclusion and, without other evidence, no submissible case was made out. We find no merit in these contentions. As stated, the death certificate constituted substantial evidence as to the cause of death.

Appellants further rely on the case of Vollmar v. Board of Jewish Education, Mo. Sup., 287 S.W.2d 868, which appellants refer to as an outstanding case which reflects a great deal of light upon the case here before the court. In that case, however, the Commission *denied* compensation and, on appeal to this court, the finding of the Commission was affirmed. While the facts have some similarity, the case is unimportant here, since in this case the Commission *awarded* compensation, and we are not concerned with whether a finding for the employer and insurer in this case would have been affirmed. See Francis v. Sam Miller Motors, Mo.Sup., 282 S.W.2d 5, 13.

The question here is whether the award, as made, is supported by competent and substantial evidence. We hold that it is and we further hold that the findings complained of are not against the overwhelming weight of the evidence.

The judgment is affirmed.

HOLLINGSWORTH, P. J., and WESTHUES, J., concur.

HYDE, J., dissents, thinking question of our jurisdiction in Workmen's Compensation death cases should be re-examined.