**Herman FRANCIS (deceased), Ethel M. Francis (dependent), Respondent,**

v.

**SAM MILLER MOTORS, Inc. (employer), and Truck Insurance Exchange (insurer), Appellants.**

**No. 44687.**

Supreme Court of Missouri.

Division No. 1.

Sept. 12, 1955.

Sam Mandell, Kansas City, Popham, Thompson, Popham, Mandell & Trusty, Kansas City, of counsel, for appellants.

David T. Cavanaugh, Thomas E. Hudson, Hudson & Cavanaugh, Kansas City, for respondent.

DALTON, Presiding Judge.

This is a compensation case. The employer and insurer have appealed from a judgment of the circuit court reversing a final award of the Industrial Commission denying compensation to claimant-respondent (widow) on account of the death of Herman Francis, an employee of Sam Miller Motors, Inc. The court ordered an award of $12,400 compensation to claimant. The amount involved gives this court jurisdiction of the appeal. Sec. 3, Art. V, Const. of Mo. 1945, V.A.M.S.

Francis, age 55, was employed as an automobile mechanic in a garage operated by the employer at 5436 Troost Avenue in Kansas City. The claim for benefits was filed on the theory that Francis suffered an accident or series of accidents, arising out of and in the course of his employment, in that on May 24, 1950, he inhaled carbon monoxide gas resulting in his death on the following day. Employer and insurer denied that Francis was caused to inhale carbon monoxide gas, or died as the result of the inhalation of such gas, or died as the result of an accident arising out of or in the course of his employment.

The Referee, and the full Commission on review, denied compensation on the ground "that the death of Herman Francis, employee, was not the result of an accident, series of accidents or occupational disease arising out of and in the course of his employment." The circuit court reversed on the ground that the Commission's award

was not supported by competent and substantial evidence upon the whole record.

We shall first state the evidence favorable to the award of the Commission denying compensation. Francis began work for Motors in October, 1929. His place of work was in stall No. 1, in the northeast front corner of the garage building and immediately to the north of the main front entrance. The north wall of the building formed the north side of the stall, a large glass show window formed its east side and a partition, extending back west from the front of the building for about the length of an automobile, formed the south side. The west side of the stall was open and faced the inside of the garage building. Above the large glass show window was a smaller window that was open. The west wall of the building was equipped with two suction fans, four feet across, and there was an exhaust fan in the top of the building. Leading from the exhaust fan was a large pipe from which flexible hose hung down so that they could be attached to the exhaust pipes of automobiles and the fumes could be carried out of the garage. The exhaust and suction fans were turned on every morning, but the individual hose had to be connected by the mechanics working on the automobiles. The stall in which Francis worked was further equipped with an electric floor fan, which could be turned on, when wanted, and Francis kept it at the north side of his stall directed up into where he was working. There were three windows in the south wall of the building which were probably open and both the front and back doors of the garage were open.

During the afternoon of May 24, 1950, Francis drove a new Hudson automobile into stall No. 1, killed the motor and began work. He had been instructed to install a purolator and to do this it was necessary to raise the hood, jack up the front end, take off the right front wheel, pull the right front dust skirt off and disconnect a lot of lines. The motor could not be operated with the oil lines unhooked. Francis had been working on this car about 45 minutes when he called to Ray Buck, who was working in the adjoining stall, "Buck, come here." Buck was working under an automobile, but in a few minutes went to Francis and found him sitting on the rear bumper of the Hudson, humped over and holding his hands over his midsection and "kind of gasping a little bit." He said he couldn't get his breath. Buck notified the shop foreman, Jerry Arthur, and Fred Beamgard was called to take Francis to Dr. Boyer's office at 5329 Troost Avenue. Beamgard found Francis sitting by the shop foreman's desk, all bent over holding his stomach. He said he was feeling pretty tough, but Beamgard started to walk with him to Dr. Boyer's office. They stopped two or three times to let Francis sit on the curb and rest. Francis "said he was in so much pain, he felt so bad, he thought he would sit down and rest a little bit." Francis was conscious when Buck came to him in the garage, and Buck did not see him slip or fall in any way. There were no oil or gas fumes present that Buck could smell. He had noticed none, the air was all right and he (Buck) suffered no ill effects, although he was working within 15 or 18 feet of Francis and, after Francis left, he finished the work on the Hudson. Francis was conscious during all the time Beamgard was taking him to Dr. Boyer's office.

Dr A. D. Boyer, an osteopath, had not known Francis prior to the time he came to his office between 4:30 and 5:00 p.m., May 24, 1950. Francis was conscious and he walked into Dr. Boyer's office. He complained of pain in his chest, neck and shoulders, and said he was very sick at his stomach and had been sick all that day. He told Dr Boyer that he had had such attacks before and that Dr. Wheatley, a chiropractor at 47th and Troost, had treated him. Francis said he had been on a fishing trip, eating a lot of fried foods and foods that didn't agree with him and that he had eaten some food a day or two before and had vomited it up. Dr. Boyer noted that his stomach was distended with gas; that his face was a gray color, his lips and fingernails were cyanotic, bluish, his breathing rather labored and his condition very serious. Dr. Boyer washed out his stomach

with soda water to make him throw up, gave him oxygen for about two hours, gave him a hypodermic of coramine to help his breathing, and also gave him a heart stimulant. Francis did not lose consciousness, but his pulse was very weak. Dr. Boyer made no tests for carbon monoxide poisoning, but carbon monoxide is an asphyxiant and "with carbon monoxide poisoning a person would have a pinkish color and an almond breath and he (Francis) had neither." Dr Boyer made no diagnosis and said he didn't know what caused Francis' death.

Mrs. Francis was called and came to Dr. Boyer's office about 7:00 p.m. When advised that her husband was a very sick man and should be in a hospital, she said he had had these spells before and Dr. Wheatley (a chiropractor) had always brought him out of them and she was going to take him home. When Mr. and Mrs. Francis left Dr. Boyer's office by taxicab about 9:30 p.m., Francis was still cramped with pain "right in the pit of the stomach." When they reached their home, Mrs. Francis assisted her husband into the house and put him to bed. His condition remained about the same that night and until the evening of the following day, when it changed for the worse. Mrs. Francis then called Dr. Wheatley, who gave Francis an enema and remained in the house until Mr. Francis passed away at about 11:30 p.m., May 25, 1950. A local undertaker was called but the body was not delivered to him, because Francis had expressed a desire to be buried by a Mr. Goodrich of Osceola, Missouri. Goodrich was called and came for the body about 3 a.m. the following morning, May 26th, and removed it to Osceola. With reference to the body, Goodrich said: "He was kind of a yellow looking, pale looking color * * *. He was all bloated up, very much bloated, and he was purging * * * when we got him." Rigor mortis had not set in "to speak of." The body was embalmed immediately, probably before daylight, and the blood drained.

When Mr. Goodrich arrived to claim the body, he was told there had been two doctors in attendance and "they" called one, the first one (Dr. Boyer) and he said that the other doctor would sign the certificate. "They" couldn't get him. A Mrs Renner was present at the Francis home when Mr. Goodrich reached there. Mr. Goodrich made up the death certificate and Mrs. Renner said she would drop over and have the doctor sign it and pick up a removal permit for the body from the City Hall and come on down the next day. Dr. Boyer testified that someone came out the next day wanting him to sign a death certificate, but that he refused to do so because he had made no diagnosis. Since it was necessary to obtain a death certificate and no physician was available at Osceola, Goodrich arranged for a Dr. G. G. Robinson of Humansville to perform an autopsy. Dr. Robinson did so about 8:00 p.m. Saturday, May 27, 1950, and then signed the death certificate.

On March 15, 1949, Francis had had a "stomach upset" and, at the request of his sister, he was taken to Dr. Edward Teubel, an M.D., for treatment. On that date he complained to Dr. Teubel of nausea, vomiting, severe pain and distress in the epigastrium region of the stomach and colicky pain of the lower abdomen, and he gave a history of gas pains, nausea and constipation for the past four years. The doctor located the pain in the epigastrium of the lower bowel on pressure and recommended that Francis go to a hospital for a G.I. series of X-rays and a gall bladder visualization, but Mrs. Francis objected and, instead, treatment was attempted. Dr. Teubel placed Mr. Francis on a milk diet and did not hear from him again until July or August in 1949. At that time Dr. Teubel found Francis "a lot worse off" than in the previous March. There were the same complaints, only more severe, and he was much worse than when he came in in March. Dr. Teubel suspected Francis might have a gastric or duodenal perforation, as "he was terribly distended." Dr. Tarson, a surgeon, was called in for consultation and agreed with Dr. Teubel that there might be a peptic or duodenal ulcer. Dr. Tarson recommended that Mr. Francis

enter a hospital, but Mrs. Francis said "No", she thought he could get along without hospital treatment.

There was evidence that Francis had, for ten or twelve years, often complained about his health to Jerry Arthur, his shop foreman. Francis took several kinds of patent medicine and on Monday, before Wednesday, May 24, 1950, he wasn't feeling well and asked off to go to a doctor and then went home. Francis had told Fred Beamgard about his stomach ulcers and stomach trouble and complained about the ulcers hurting him. He recommended Willard tablets to Beamgard, who also had stomach trouble, and he advised Beamgard that the tablets helped him. Francis told Ray Buck (who ate lunch with him) that there was something wrong with his stomach; and that he could not eat much. Francis had been taking big white pills, which he said were Willard pills; and when he ate lunch with Buck he didn't eat very heavy, and lots of times his lunch was just a glass of milk, a little cereal or something like that.

The testimony of Dr. Victor B. Buhler, an M.D. and specialist in pathology, tended to show that, about June 1, 1950, he received from Dr. G. G. Robinson the heart, and parts of the lung, liver, spleen, kidneys, small bowel and brain of Herman Francis, deceased, and from these parts he could not establish the cause of death. He said that carbon monoxide poisoning is produced by the inhalation of carbon monoxide, which forms a chemical union with the hemoglobin in the blood, replacing the oxygen and, when an individual loses the oxygen-carrying capacity of the blood, he dies. The first symptoms of carbon monoxide poisoning are haziness, dizziness, and then unconsciousness. Unconsciousness is always present where carbon monoxide poisoning results in death. As a general rule, pain is not associated with carbon monoxide poisoning. The chemical union of carbon monoxide with hemoglobin produces a characteristic cherry red coloring to the blood which is imparted to the tissues. The cherry red coloring is characteristic of carbon monoxide poisoning and, when the

veins and arteries and circulatory system are drained of blood in the embalming process, the cherry red color is still present in the blood remaining in the tissues. However, the cherry red color of the small intestine, coupled with the absence of other visible cause of death would not be sufficient to charge the death to carbon monoxide poisoning. The degenerative changes produced in the brain by oxygen starvation by reason of carbon monoxide poisoning result in a cerebral edema. Dr. Buhler found no such edema in the brain section sent him. Since carbon monoxide poisoning always produces unconsciousness as a prelude to death, the fact that there was no history of unconsciousness in this case was quite significant in ruling out carbon monoxide poisoning as a cause. In his opinion Francis' death did not result from carbon monoxide poisoning. Dr. Buhler was not sent any parts of the gall bladder, stomach or duodenum. Those parts would have had to be removed and examined to establish that a rupture of one of those organs was not the cause of death.

Dr. Jacob S. Hoffman, and M.D., specializing in internal medicine, testified that coma or unconsciousness is always present with a moderate degree of carbon monoxide poisoning. In answer to hypothetical questions, assuming certain facts shown in evidence, Dr. Hoffman testified that in his opinion the death was not caused by carbon monoxide poisoning, but was more likely caused by a ruptured peptic ulcer. He said that in order to prove or disprove a ruptured viscus as the cause of death, the parts particularly to be examined would be the stomach, duodenum and gall bladder; and that evidence of gastric disturbance and of abdominal distress was not consistent with carbon monoxide poisoning, but was consistent with a ruptured peptic ulcer.

The evidence favorable to claimant-respondent was substantially as follows: Mrs. Francis testified that her husband appeared to be in good health when he left for work on the morning of May 24th. Based upon her observations, she said he had nothing physically wrong with him.

He had made no complaints at any time of any disability. He had not been taking medicine for the treatment of any stomach condition and he had not been losing weight. She learned of his illness in the afternoon and arrived at Dr. Boyer's office about 7:00 p.m. She found her husband partly conscious and on a table in the doctor's office. He appeared to be in physical distress and was holding his chest. His face was flushed. Dr. Boyer gave him some soda water to make him throw up and about 9:30 p.m. he appeared to be feeling a little better and sat up. She then took him home. The following day, his condition became worse. He moaned and complained of pains through his chest during the entire day and evening. He had no color in his face, except a bluish look and manifested difficulty in getting around when he went to the bathroom. He also appeared to have distress in his abdomen. After his death, the body was taken to Osceola and claimant authorized an autopsy on the body by Dr. G. G. Robinson.

Claimant's daughter, Mary, testified that her father was in good health prior to his death and she had been on a fishing trip with him on May 20th and 21st. He had made no complaints regarding his health or about stomach pains. He worked actively in and about the home and required no special diet. Edith Patch, an acquaintance, had observed no physical disabilities of any kind. She never heard him complain of any physical disability or distress. Mrs. Eva Waterhouse had seen and observed him for six years and she had never heard him complain of any physical disability. He required no special diet and ate regularly the same food as any member of the family. William A. Cartmill had known him since 1947. He had worked with him and had fished and boated with him on many occasions, once within five or six weeks prior to his death. Francis appeared in good health, required no special diet and, to his knowledge, did not take any pills or medicine for any stomach ailment. Al Weinzerl had worked with him at George Welsh Motors, had gone fishing and hunting with him on many occasions, had never heard

him complain of any physical disability, or known of his taking medicine or requiring any special diet. There was other evidence that Francis worked "pretty regularly" and was the best mechanic at the garage. He serviced John E. Ferguson's automobile for a number of years and Ferguson never heard him complain about any illness of any kind.

There was evidence that the garage in question serviced from ten to fifty automobiles per day "with an average in between"; that these automobiles were driven in and out of the garage and during such times no hose were attached to the exhausts; that the floor fan in stall No. 1 was blowing air up in the corner where Francis was working; that "most generally" there was "a lot of smoke and gas and fumes", as it was a large garage; and that lots of times you could smell the fumes from the exhaust pipes when the motors were being operated. There was no evidence that the paint shop in the garage was in operation, but spray painting produces a certain amount of fumes. John Ferguson, a manufacturer from Excelsior Springs, Missouri, who had employed Mrs. Francis, was in the garage in question in February, 1950, and the fumes in the stall where Francis was working were very objectional and he (Ferguson) left the building while work was being done on his automobile. In working on the Ferguson automobile, Francis had the engine running, but had no hose attached to the exhaust pipe.

Over the objection of the employer and insurer that the evidence was hearsay and not binding in any manner on the employer and insurer, Mrs. Francis was permitted to testify that, while she was in Dr. Boyer's office, Jerry Arthur, the employer's shop foreman, called her and asked about her husband and when advised that he was awful sick, Arthur said: "Well, you know he got carbon monoxide poisoning", and he (Arthur) further said that it was awful hot in the garage that day; that Francis was working back in a corner, and when they got him he had fallen off of a stool or something he was sitting on; and that "we got

him out in the fresh air and brought him to." She further testified that, on the day following her husband's death, Mr. Arthur came to her house and, in the presence of her daughter and certain friends, said that it was very hot in the garage; that there was a lot of gas and smoke from the cars; and that Francis breathed the fumes and passed out. Respondent's daughter, Mary, and Edith Patch and Vera Byrd testified substantially to the same effect concerning Arthur's conversation at the Francis home. Mr. Arthur denied that he telephoned Mrs. Francis at Dr. Boyer's office and he denied the several statements attributed to him.

Over the objection of the employer and insurer that it was incompetent, because not made by a person named or empowered by Section 193.140 RSMo 1949, V.A.M.S., to make it, the death certificate executed by Dr. G. G. Robinson was received in evidence. It recited that carbon monoxide gas poisoning was the disease or condition directly leading to the death of Herman Francis. Recitals in the certificate, as to "accident" in "garage" in "K.C.", "May 24, 1950, 4:30 p.m.," "while at work" by "Inhalation of carbon monoxide", were excluded.

Dr. G. G. Robinson, an M.D., but not a specialist in any field, testified by deposition that he had not known Herman Francis in his lifetime, but he had perfomed an autopsy on the body after it had been embalmed. He sent the heart and sections of the lung, spleen, liver and lower bowel to Dr. Buhler, a pathologist. Dr. Robinson found nothing significant about the outside of the body and no cherry red color in any of the organs except the small intestine, which apparently had not been subjected to the embalming fluid. He noticed that a section of the intestine changed color when he put it in a preservative to send to Dr. Buhler. He did not know whether, in cases of carbon monoxide poisoning, the embalmed portions of the body would retain their cherry red color even after the body began to decompose. He made no tests of any blood. He had not specialized in carbon monoxide poisoning and had never before performed

an autopsy where carbon monoxide was in question. He obtained the information from others about the manner in which Mr. Francis became ill and died. He said he recognized that carbon monoxide poisoning is supposed to be one of the most painless ways of dying; that the first symptoms of such poisoning are coma and unconsciousness and he understood that it was a poison that robs one of all volition and eventually ends in a coma which, in turn, results in death. He said that he had read the portions of a medical book in his office on carbon monoxide poisoning and had spent considerable time reading up, trying to figure out the real cause of the death in question. It was his opinion that carbon monoxide poisoning was the cause of the death. In answer to a hypothetical question incorporating facts shown by the employer's evidence, he said that, if he had known all of these things, he would still be of the opinion that Francis died of carbon monoxide poisoning. He considered that his opinion, as to the cause of death, was confirmed by Dr. Buhler's failure to find any diseased condition in the parts of the body sent to him.

Appellants insist that carbon monoxide poisoning was not shown to be the cause of death; that the finding of the Commission that death was not the result of an accident arising out of and in the course of the employment and the Commission's award denying compensation are supported by competent and substantial evidence in the record; and that the trial court erred in entering judgment for respondent.

In reviewing a compensation case we have the duty to determine whether the Commission's award is supported by competent and substantial evidence upon the whole record. Sec. 22, Art. V, Const. of Mo. 1945, V.A.M.S. This court has said that "This does not mean that the reviewing court may substitute its own judgment on the evidence for that of the administrative tribunal. But it does authorize it to decide whether such tribunal could have reasonably made its findings, and reached its result, upon consideration of all of the

evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence. Of course, the reviewing court should adhere to the rule of deference to findings, involving credibility of witnesses, made by those before whom the witnesses gave oral testimony." Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647, 649; Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55, 62.

In determining whether the Commission could have reasonably made its findings, and reached the conclusion it did reach, upon consideration of all the evidence before it, we view the record in a light most favorable to the findings of the Commission, consider the favorable inferences which the Commission had a right to draw from the evidence before it, and then determine whether the Commission's findings, even if supported by competent and substantial evidence, are contrary to the overwhelming weight of evidence in the whole record. Thacker v. Massman Const. Co., Mo.Sup., 247 S.W.2d 623, 627.

■ The burden of proof in this case rested upon the claimant-respondent to prove, not only that the death of Herman Francis resulted from carbon monoxide poisoning, but that his injury and death arose out of and in the course of his employment. Fowler v. Baalmann, Inc., 361 Mo. 204, 234 S.W.2d 11, 16; Seabaugh's Dependents v. Garver Lumber Mfg. Co., supra. Respondent offered no direct evidence of accident and injury in the course of her husband's employment and no direct evidence necessarily inconsistent with mere illness at his place of employment. The evidence shows that Francis became ill while at work in the garage and that he was removed therefrom. There was no direct evidence of the presence of carbon monoxide in any appreciable quantities in or about the garage in question. Nor was there evidence of any unusual conditions existing in or about stall No. 1 or in the garage on the afternoon of May 24, 1950. Respondent relies upon the alleged statements of the employer's garage foreman in a telephone conversation with respondent about 9:00 p.m., on May 24th, and while she was in Dr. Boyer's office. She also relies upon his alleged statements to her and others at her home on the day following her husband's death. Appellants objected to the introduction of this evidence and here contend that the statements were inadmissible as hearsay and that they do not constitute competent opinion evidence tending to establish carbon monoxide poisoning, citing Redmon v. Metropolitan St. Ry. Co., 185 Mo. 1, 11, 84 S.W. 26, and other cases. Respondent says the statements, while not a part of the res gestae, were competent and binding admissions to show "the working conditions present in the garage" and the employer's "knowledge" thereof. We need not stop to determine the admissibility of this evidence. The referee permitted it to be received in evidence. Its credibility, weight and value in the first instance depended upon the oral testimony of the several witnesses who testified concerning the several alleged statements, all of which statements were expressly denied by the employer's foreman Arthur, who also personally appeared and testified. The weight and value of the testimony of the witnesses and the weight and value to be given to the statements, if made, rested with the triers of the facts. It is apparent from the Commission's findings that it did not consider the testimony to be satisfactory evidence of carbon monoxide poisoning.

■ The issue as to the prior health of Francis, as bearing upon the question of accident and injury, was for the determination of the Commission upon the conflicting oral testimony of the various witnesses, including Dr. Edward C. Teubel, all of whom appeared personally before the referee. The credibility, weight and value of this oral testimony was for the referee and the Commission and, as stated, "the reviewing court should adhere to the rule of deference to findings, involving credibility of witnesses, made by those before whom the witnesses gave oral testimony." The

preponderance, weight and value of oral testimony of course does not turn upon the number of witnesses who testify to any particular fact. Chamberlain v. Missouri-Arkansas Coach Lines, 351 Mo. 203, 173 S. W.2d 57, 62.

■ On the issue of the cause of death we have the conflicting oral testimony of witnesses concerning the facts and circumstances attending the illness and death, as well as the conflicting opinions of the medical witnesses as to the cause of death. In this connection appellants contend that the death certificate executed by Dr. Robinson should not have been received in evidence for any purpose; that Dr. Robinson was neither the physician last in attendance, nor the coroner of Jackson County, nor a proper person to execute the certificate; and that it was based entirely upon hearsay and inadmissible to establish death from carbon monoxide poisoning. Appellants further contend that Dr. Robinson did not qualify as an expert on carbon monoxide poisoning; that his testimony is inherently infirm; and that it is not entitled to any probative value. Appellants also contend "there is no competent, substantial evidence in the record which supports a finding that the death of Herman Francis was the result of an accident arising out of and in the course of his employment by Sam Miller Motors, Inc." On this record it is unnecessary for us to review these assignments. The Commission admitted the certified copy of the death certificate and also the deposition of Dr. Robinson. The death certificate was only prima facie evidence as to the cause of death. Section 193.170 RSMo 1949, V.A.M.S. The burden of proof to establish carbon monoxide poisoning as the cause remained on respondent. All of the evidence referred to concerning the cause of death and the circumstances attending it was before the referee and Commission to be weighed and its weight and value determined. The attendant facts and circumstances concerning the execution of the death certificate, the quali-

fication of Dr. Robinson, his opportunity to know the facts and the grounds for his opinion testimony were before the Commission, when it determined the fact issues presented by the record. On this record it is only necessary for this court to determine two questions. (1) Is the award of the Commission denying compensation supported by competent and substantial evidence upon the whole record; and (2) Is the finding and decision of the Commission clearly contrary to the overwhelming weight of the evidence? We need not determine whether findings favorable to claimant, and an award of compensation to her, would have been supported by competent and substantial evidence. The question is whether the findings and award, as made, are so supported. Karch v. Empire Dist. Electric Co., 358 Mo. 1062, 218 S.W. 2d 765, 770.

As stated, the Referee expressly found, not only that claimant had "failed to prove that the employee had sustained an accident, series of accidents, or occupational disease", but further found "from all the evidence that the death of the employee was not the result of an accident, series of accidents, or occupational disease, arising out of and in the course of his employment, as alleged. On review by the full Commission, the finding of the referee was sustained and compensation was denied.

■ From a careful consideration of the whole record, we have reached the conclusion that the award of the Commission, denying compensation, is based upon competent and substantial evidence upon the whole record; and that the findings and award are not against the overwhelming weight of the evidence.

The judgment of the circuit court must be reversed and the cause remanded with directions to affirm the award of the Commission. It is so ordered.

All concur.