[1] This is a proceeding under the workmen's compensation law, Secs. 3689-3766, R.S.Mo. 1939, Mo.R.S.A. §§ 3689-3766, and involves two claims for the death benefit allegedly due and payable because of the death of one Bennie Stamps, an employee of Century Electric Company, the employer and self-insurer.
[2] The one claimant is Fannie Stamps, who professes to be the widow of the deceased, while the other is Alice Porter, who claims the status of a dependent mother. Both claims were heard together before the referee as well as upon review before the industrial commission.
[3] In both instances there was a denial of compensation upon a finding that the death of the employee had not been the result of an accident arising out of and in the course of his employment. Having ruled that the employee's death was not compensable, neither the referee nor the industrial commission made any finding whatever upon the question of the status or dependency of either claimant. After the entry of the adverse award by the industrial commission, the mother Alice Porter, took no further action in the case. However the alleged widow, Fannie Stamps, appealed to the circuit court, where in due time the award of the industrial commission was affirmed. Fannie Stamps thereupon gave notice of appeal, and by subsequent steps has caused the case to be transferred to this court for our review.
[4] Our appellate jurisdiction is derived from the fact that the amount in dispute is the sum of $6,400, the parties apparently agreeing that such figure represents the amount of the death benefit to which Fannie Stamps would have been entitled if the claim had been found to be compensable and she had been found to be the widow of the deceased. Const. of 1945, Art. V, Secs. 3, 13, Mo.R.S.A.
[5] As already indicated, the claim was based upon the theory that Stamps' death was by accident arising out of and in the course of his employment. The case involves no question of occupational disease, and in fact it appears that the employer had not elected to accept the occupational disease amendment.
[6] The employer, Century Electric Company, is engaged in the business of manufacturing electric motors, for which purpose it maintains and operates a plant at Eighteenth and Pine Streets in the City of St. Louis.
[7] The employee, a colored man twenty-six years of age, had been in the service of the company for some six months at the time of his death on December 26, 1945. His status was that of a common laborer, and he was assigned to the fourth floor of the company's Building A on the north side of Pine Street, where his duties included various laboring jobs, such as *Page 495 
pushing trucks loaded with supplies up and down the aisles on the floor, and stacking electric motor end brackets in bins.
[8] On the morning in question Stamps reported for work at about 8:10 a. m., which was a few minutes late, and was told by his foreman to take brackets off a truck and stack them in a bin. The person seemingly nearest to him while his work was being performed was one Goldie Valentine, who worked at a table not far from the bin where the brackets were being stacked. Prior to Stamps' death, which occurred about 10:30 a. m., Miss Valentine observed him sitting on a box just inside the bin engaged in stacking brackets as he had been directed. It was the day immediately following Christmas, and the several employees, including Stamps, were laughing and joking with one another. He appeared to be well and in good spirits, and gave no evidence of what was soon to occur. Miss Valentine had occasion to walk about ten feet away from the bin to empty a box, and when she came back to her table she saw Stamps lying on the floor with his feet inside the bin and his body outside. He was groaning and frothing at the mouth, but was otherwise making no movements of any kind. Other persons were attracted by her screams, and Stamps was shortly carried away on a stretcher and pronounced dead by the plant physician, following which his body was removed to the City Morgue for an inquest to be held by the coroner's office.
[9] Not only did Stamps fall dead in the manner indicated on December 26th, but strangely enough two other young colored men died under similar circumstances and without previous symptoms of illness, the one on December 27th, and the other on December 28th. While the greater part of the evidence relating to the deaths of the other two men was excluded from the case, it nevertheless appears that they too were employees of Century Electric Company. At any rate, all three cases were being inquired into by the coroner's office at one and the same time, and when the gross autopsy findings by the coroner's physician proved to be entirely negative, Dr. Walter J. Siebert, a local pathologist, was employed by the coroner to investigate the deaths.
[10] As the result of his microscopic studies Dr. Siebert found intense hyperemia of the lungs with interstitial hemorrhages, marked albuminous degeneration of the tubular epithelium of the kidneys, and both local and central degeneration of the liver cells. The specific cause of death being still in doubt, and lacking a toxicological laboratory equipped for analyzing the tissues chemically, Dr. Siebert then transmitted certain specimens of the organs and blood of all three men to Dr. William D. McNally, a toxicologist in Chicago, who is a nationally recognized authority and writer on the subject, and is the toxicologist employed by the Cook County coroner's office. It is significant that Dr. McNally was selected by Dr. Siebert on behalf of the local coroner's office, and not by Century Electric Company, whose witness he became.
[11] Dr. McNally had been brought into the case on January 19, 1946, and on the following February 4th he wrote Dr. Siebert, advising that from his examination of the slides and his chemical examination of the tissues submitted, he was of the opinion that death had been due to the inhalation of a chlorinated hydrocarbon. It will be observed that he did not specify which of the thousands of chlorinated hydrocarbons it was that he had found, although Dr. Siebert, in his letter to Dr. McNally, had asked that he make such examination as he saw fit for the poisons suggested by the microscopic findings, mentioning, at the outset, carbon tetrachloride. Following a telephone conversation with claimant's attorney, Dr. McNally then proceeded to make further and more intensive tests, and finally identified the substance present in the tissues as tetrachlorethylene, which, incidentally, the employer did not use in its plant.
[12] While neither the referee nor the industrial commission made any specific evidentiary findings, but only the ultimate constitutive finding that the employee's death had not been by accident arising out of and in the course of his employment, it is nevertheless obvious that compensation *Page 496 
was denied because of a belief in Dr. McNally's testimony that death had been due to the inhalation or ingestion of tetrachlorethylene, which was not present at the plant, and was not used in connection with the employment.
[13] Now the claimant argues, as the basis for a reversal, that there was not sufficient evidence in the record to warrant the making of such award. Specifically it seems to be the claimant's theory that since Stamps' death was concededly due to poisoning and admittedly occurred during the time and at the place of his employment, the presumption was to be indulged that his death arose out of and in the course of his employment; that such presumption cast upon the employer the burden of rebutting the conclusion that death was due to accident arising out of and in the course of the employment; that the employer's evidence was at best merely conjectural as to whether Stamps might have come in contact with any chlorinated hydrocarbon at any time or place other than the time or place of his employment; and that in such a state of the record there is no evidence upon which an award denying compensation may be allowed to stand.
[14] It is true that when an employee charged with the performance of a duty is found injured or dead at a place where his duty required him to be, a presumption may arise that his injury or death was by accident arising out of and in the course of his employment. Mershon v. Missouri Public Service Corporation, Mo.Sup., 221 S.W.2d 165; Oswald v. Caradine Hat Co., Mo.App., 109 S.W.2d 893. Of course it is recognized that the nature and circumstances of the injury or death may be such that the presumption does not arise, as where sufficient relevant facts are known as to bring the inquiry within the realm of actuality.
[15] However the presumption is in any event but a rebuttable procedural presumption, which does not affect the claimant's continuing burden of persuasion, but merely imposes upon the employer the burden of producing evidence upon the question of the nonexistence of the fact presumed. Such a presumption is overcome by substantial contravening evidence on the part of the employer; and where the facts appear, the case is then to be decided upon the facts, having in mind all the while that it is not the employer's fundamental burden to show his freedom from liability, but that the burden is on the one seeking compensation to show that the injury or death was by accident arising out of and in the course of the employment. Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55; Goetz v. J. D. Carson Co., 357 Mo. 125, 206 S.W.2d 530.
[16] Furthermore, so far as the support for an adverse award is concerned, it is immaterial whether the commission reaches its conclusion upon a belief of the employer's evidence or a disbelief of the claimant's evidence, since in either event the result would be to deny the claim for compensation. Scott v. Wheelock Bros., 357 Mo. 480, 209 S.W.2d 149; Carnahan v. Kurn, Mo.App., 113 S.W.2d 824.
[17] However the truth of the matter is that despite what the claimant says about a presumption operating in her favor, she did not rely for her recovery on any such basis, but instead proceeded on the theory that Dr. McNally's findings should be accepted in so far as he reported that death had been due to the inhalation of a chlorinated hydrocarbon, and should be rejected in so far as he identified the particular chemical as tetrachlorethylene, which was not used in the deceased's employment. On the contrary, she argues that the lethal substance was undoubtedly trichlorethylene, a chlorinated hydrocarbon which is toxic just as is tetrachlorethylene, and one which was regularly used in the employer's plant in the form of a product known by the trade name of Blacosolv.
[18] Both tetrachlorethylene and trichlorethylene are solvents widely used in industry as degreasers and cleansing agents. On the floor where the deceased was employed there were eight separate tables, at each of which two girls were assigned to assemble motors. Their total work involved the assembling of from three hundred to four hundred motors a day, and after a motor was assembled and its four to nine *Page 497 
switch points soldered, the switch points would then be brushed with a solution of Blacosolv to clean them. A supply of Blacosolv was customarily kept in a milk bottle on each table, and when a bottle became empty it was refilled out of a gallon can which was kept on the floor, and which was itself filled out of a large drum of the substance which was kept in the rust-proofing room or degreasing tank in the basement of a different building from the one in which Stamps was employed. The degreasing tank was in charge of one Liggons, who had been engaged in operating the tank for about six years; and while there was evidence that about once a month certain of the laborers, including Stamps, would be sent to Liggons' room to get a supply of Blacosolv, Liggons testified that Stamps had never come to the room that he remembered, and that regardless of who it was that came, it was he and not the men who poured the Blacosolv into the cans.
[19] While it is true that tetrachlorethylene and trichlorethylene are both hydrocarbons and that the pathological picture is identical in the event of death from the inhalation of either, the conclusion is nevertheless inescapable from the whole record in the case that the award denying compensation was not only supported by sufficient evidence, but was in accord with the overwhelming weight of the evidence.
[20] Tetrachlorethylene and trichlorethylene are distinct compounds, and Blacosolv does not contain tetrachlorethylene, but only trichlorethylene. Still if Dr. McNally was to be believed, it was only tetrachlorethylene, and not trichlorethylene, that was found in Stamps' tissues. This of itself would eliminate the Blacosolv as the cause of Stamps' death; and except for the admittedly inconclusive tests made by Dr. Siebert, there were no other tests or examinations made. To be sure there was an opinion by Dr. Quebedeaux, a research chemist and not a toxicologist, that Dr. McNally's tests were themselves not conclusive and did not rule out the possibility of the presence of trichlorethylene in Stamps' body, although it is significant that Dr. Quebedeaux would not go so far as to say that Dr. McNally's finding was wrong, or that Stamps' death was actually attributable to anything other than tetrachlorethylene. Whatever conflict there was between Dr. Quebedeaux on the one hand and Dr. McNally on the other merely emphasizes the fact that the issue of their respective credibility was one for the referee in the first instance and the industrial commission on review; and regardless of everything that the claimant has to say in criticism of Dr. McNally's testimony, it was within the province of both the referee and the commission to accept his conclusion and give it credence as they did.
[21] Indeed, any idea that Stamps came to his death as the result of the inhalation of trichlorethylene is strongly refuted by facts and circumstances so clear and convincing to the ordinary mind as to need no support from expert testimony. Other employees on the premises, and particularly the sixteen girls at the assembling tables, worked constantly in close contact with Blacosolv, and not one of them was ever made sick or injured by it. Stamps, on the other hand, had had but little contact with it, and did not degreasing or other kind of work which required him to make any use of it whatever. It was not even a part of his duty to take supplies to the girls at the assembling tables. One man took frequent naps in the very bin where Stamps was sitting when he died. Liggons handled Blacosolv in large quantities, and he sustained no ill effects. The building in which Stamps was employed was entirely separate from the one in which the main supply of Blacosolv was kept. All these things point unmistakably to the fact that Stamps did not die from the inhalation of fumes from Blacosolv, and confirm Dr. McNally's opinion that death was totally unassociated with any hazard connected with his employment.
[22] The claimant says that any doubt respecting the right to compensation should be resolved in her favor. In the first place, the record would seem to leave no room for doubt, since even if Dr. McNally's finding were to be excluded from consideration, there would still be no convincing evidence that Stamps died from any hazard *Page 498 
at his work. However the rule of liberal construction for which the claimant argues does not permit the allowance of a claim which lacks any one of the essential elements required by the act, Mershon v. Missouri Public Service Corporation, supra, and in this case the missing element is the fact that the accident arose out of the employment.
[23] Upon a consideration of all the evidence before it, the commission could reasonably have made its findings and reached its result; and the claimant is wrong in her insistence that there was not sufficient evidence to warrant the denial of compensation.
[24] Finally the claimant argues that in the event the court should fail to hold that she is entitled to an award in her favor on the present record, the case should none the less be reversed and remanded with directions to the commission to make specific findings of fact and rulings of law so as to advise the court of the precise theory upon which the compensation was denied.
[25] We have already pointed out that compensation was obviously denied upon a finding that the employee's death had been due to the inhalation of tetrachlorethylene, which was not present on the premises, and was not used in connection with the employment. As the case was tried, the issue of the cause of death was sharply drawn; and such a finding of facts as that for which the claimant asks could add nothing to the case that is not already abundantly clear. Both parties have recognized the matters in dispute, and have argued such matters ably and persuasively in their respective presentations of the case.
[26] But aside from all this, it has been repeatedly said that findings merely evidentiary in character should be excluded from the findings of fact which are to become a part of the record of the cause, and that the record should only recite the ultimate constitutive facts upon which an award can be predicated as a conclusion of law. Leilich v. Chevrolet Motor Co., 328 Mo. 112,40 S.W.2d 601; Williams v. International Shoe Co., Mo.App., 213 S.W.2d 657, Jones v. Remington Arms Co., Mo. App., 209 S.W.2d 156.
[27] The commission found that the death of the employee was not the result of an accident arising out of and in the course of his employment. This was a direct finding upon the ultimate fact in controversy, Leilich v. Chevrolet Motor Co., supra, and while the claimant did unavailingly ask that such finding be amplified, it would serve no useful purpose to send the case back for additional or more detailed findings where the reason for the commission's present finding is not at all in doubt.
[28] It follows that the judgment rendered by the circuit court should be affirmed; and the Commissioner so recommends.