Junior DeWayne JACKSON, Claimant-Appellant,

v.

McDONNELL AIRCRAFT CORPORATION, Employer-Respondent.

No. 32741.

St. Louis Court of Appeals.

Missouri.

Feb. 20, 1968.

Rehearing Denied March 21, 1968.

Donald M. Witte, George G. White, Brentwood, Satz & Ponfil, St. Louis, for claimant-appellant.

Robertson, De Voto & Wieland, Louis A. Robertson, Robert E. Wieland, Morton K. Lange, St. Louis, for employer-respondent.

DOERNER, Commissioner.

This appeal, originally taken to the Supreme Court but transferred here for lack of jurisdiction, involves a claim for compensation under the Workmen's Compensation Law.

On August 24, 1964, a few minutes before the end of his work day, claimant was observed to be standing, with his arms at his side, in the area where the last task assigned to him had been completed by him and approved by the employer's inspector. When first observed claimant was bleeding profusely from a severe cut on the right side of his throat which had severed his jugular vein and his posterior facial vein. At the hearing before the Referee claimant testified that he had no memory of any activities or events which occurred on the day in question subsequent to his reporting for work at 7:00 A.M. Neither party produced an eyewitness as to the manner in which claimant had sustained his injury. In the absence of any direct evidence as to the

way in which he had been injured claimant throughout the proceeding has relied on the presumption stated as a part of what the court called its "general observations" in Mershon v. Missouri Public Service Corp., 359 Mo. 257, 221 S.W.2d 165, 167, that, " * * * the burden is on a claimant to show that an employee's injury resulted from an accident arising out of and in the course of his employment; but, when an employee charged with the performance of a duty is found injured at a place where his duty required him to be, a presumption arises that he was injured in the course of and in consequence of his employment; that such presumption is rebuttable." Employer, by its amended answer, denied that claimant had been injured in an accident arising out of and in the course of his employment and pleaded the affirmative defense that whatever injury the claimant had sustained was "self-inflicted and not the result of an accident." The Referee and the Industrial Commission denied claimant's claim for compensation, and on his appeal the Circuit Court of St. Louis County affirmed the Commission's final award.

The evidence developed during the claimant's presentation of his case showed the following: Claimant, 30 years of age at the time of the hearing in February, 1965, was first employed by the employer, McDonnell Aircraft Corporation, on March 3, 1958, but voluntarily resigned on July 11, 1958. He was rehired on April 11, 1961, and continued in the employ of McDonnell until August 24, 1964, being then classified as a Mechanic Airplane Production, Grade 1. On January 28, 1963 he consulted Dr. James E. Meyer, a general practitioner, complaining of an enlarged varicocele and nervousness. Dr. Meyer prescribed a suspensory but no medication. On July 17, 1963, the claimant saw the doctor and complained of anorexia, loss of appetite, nervousness and diarrhea. Dr. Meyer prescribed a tranquilizer and advised claimant to return in a week, but claimant did not return until January 27, 1964.

His chief complaints then were loss of appetite and nervousness, and the diagnosis the doctor made was anorexia, nervosa, depression and symptoms of nervousness. Claimant's next consultation with the doctor was on July 23, 1964, at which time Dr. Meyer found the claimant depressed and without appetite. On that day the doctor urged claimant to see a psychiatrist, Dr. Edwin Schmidt, gave claimant a vitamin shot, and prescribed Librium, an antibiotic. On July 27, 1964 claimant returned to Dr. Meyer, who found him still depressed, with no improvement, and since claimant had not seen Dr. Schmidt the doctor again urged him to do so. The last time the doctor saw claimant prior to the subject occurrence was on August 21, 1964, when he found him slightly improved but still depressed and without appetite, and for the third time urged claimant to see Dr. Schmidt, the psychiatrist Dr. Meyer had recommended.

Between January 1, 1964, and August 24, 1964, claimant was absent from his employment on 26 days, the last of which was on August 21. Of these, 12 were recorded as being due to personal reasons and 14, including that on August 21, for illness. On July 27, or 28, 1964 David P. Barbeau, the assistant foreman then over claimant, together with the union's shop steward and Hoelting, Barbeau's supervisor, talked to the claimant about his absenteeism. Claimant told them that he was extremely nervous and under a doctor's care, and that his doctor had recommended he see a psychiatrist. Claimant's evidence also showed that he was on his vacation for two weeks beginning August 3, 1964, and that he returned to work on August 17, 1964.

According to claimant's wife he arose at 5:30 A.M. on August 24, 1964, ate his breakfast, played with his young daughter, and discussed with her her plans for the day and their plans to go somewhere after work. Claimant departed at 5:45 A.M. after kissing her good-bye. Claimant testified that he remembered riding to work

that morning in a car pool, but stated that he didn't know the names of any of the other members of the pool except a man named Cooper, whose first name he didn't know. He did know that he reported for work that morning at 7:00 A.M., in Building 1, Department 177, but testified as previously stated, that he could not recall anything after that time on that day. When first cross-examined claimant was asked, " * * * Have you ever been treated for a nervous condition before August 24, 1964?" and answered, "Yes, sir." He was then asked who had treated him for such nervous condition and replied, "Dr. Meyers, sir." Claimant's cross-examination was interrupted for the appearance of other of his witnesses, and when it was resumed six days later he was asked and answered:

"Q With reference to Dr. Meyer, do you know how long you had been under his care and attention—under the care and attention of Dr. Meyer. Can you tell me how long Dr. Meyer had been treating you for any condition?

"A No, sir.

"Q Before August 24th?

"A. No, sir.

"Q And I believe you did testify he was treating you for nervousness, is that correct, before August 24, 1964, or did you say that?

"A I don't remember.

"Q You don't remember. And let me ask you this then: Were you being treated for a nervous condition by Dr. Meyer before August 24, 1964?

"A I don't remember."

At 2:11 P.M. on August 24, 1964, Lester J. Presley, the assistant foreman then in charge of claimant, assigned him the task of replacing a bolt of improper length with one of the proper length on a control rod. The rod was located in a hole or compartment underneath door L–89 on an airplane under construction designated as C–230. The so-called door was in fact a flat sheet of metal approximately 8 inches by 14 inches in size, fastened to the underneath side of the left wing of the plane by screws, and was situated close to the fuselage. The underside of the wing was about 7 feet off the floor. The meticulous records kept by the employer, which were introduced by claimant, reveal that claimant completed the replacement of the bolt and requested an inspection of his work at about 3:00 P.M., preparatory to closing the door; that Gerald W. Mueller, an inspector, examined the work performed and approved the closing of the door at some time between 3:00 and 3:10 P.M.; that claimant proceeded to close the door and called for an inspection of the closed door and a seal to be placed thereon, which was used to indicate that an inspection had been made; that Mueller inspected and approved the door as closed and placed the seal, a decal, thereon some time between 3:23 and 3:30; and that this completed claimant's work on the door and no other work was assigned to him, as his work day was to end at 3:30.

According to Barbeau, called by claimant as his witness, he was at his desk, about 35 to 40 feet from the left wing of plane C–230, when an employee named Lyons told him that claimant was bleeding from the face. From that position he could not see claimant. He immediately proceeded towards claimant, whom he first saw when he rounded the tail of plane C–230. Claimant was standing upright beneath the left wing of plane C–230, in the area where he had been working, with his arms at his side, bleeding heavily from a cut on the right side of his neck. Barbeau was the first person to reach claimant, and with the help of Clarence Cooper, an inspector who was right behind him, they laid claimant on a work stand located about 12 inches from where he had been standing. Barbeau rolled claimant on his left side and attempted to stanch the flow of blood with first a handkerchief, and

when it quickly became saturated, with a pile of cheese cloth. Claimant, according to Barbeau, made no statement and at first had his eyes open and made an attempt to raise up, but then closed his eyes and just laid there. An assistant foreman, George Staton, asked Barbeau if he had the pressure point, and when Barbeau replied in the negative, asked to try to locate it. Barbeau then walked around claimant's head and in front of him, and upon looking down saw that claimant had a knife clenched in his left hand. There was blood on the knife. Barbeau removed it from claimant's hand by taking hold of his fingers and prying them open, and laid the knife on the work stand.

The emergency alarm had been sounded and Ethel Wood, the nurse from the first aid room arrived, who also attempted to stop the flow of blood. Barbeau helped place claimant on a stretcher and carry him to the first aid room. He washed his hands and returned to the area where claimant had been working. Barbeau looked at the speed brake, doors L–86 and L–89, and other areas to see if there was any blood on the airplane, and saw none. He was asked whether, when he reached claimant, there was anything in either of claimant's hands, and answered: "I didn't notice. I didn't see anything."

In addition to the nurse, claimant received the attention of Dr. C. Athraus, who was in the plant at the time. Claimant was conveyed to Deaconess Hospital in St. Louis in an ambulance, and was accompanied by the nurse. It was stipulated that prior to his admission to the hospital 500 cc's of Dextron was administered to him by the nurse. Dr. Vincent T. Houston, called by the claimant, testified that when he first saw claimant in the hospital's emergency room claimant was hemorrhaging from the wound on the right side of the neck, from which he was bleeding internally as well as externally. Dr. Houston, a surgeon, described the wound as about 8 centimeters or 25%⁄100 inches long, "* * * an incised wound in counterdis-

tinction to what I would call a lacerated wound * * *" with "* * * clear, sharp borders, not irregular, not torn, and was a straight, sharp bordered incisive thing * * *" which appeared, in his opinion, to have been "* * * caused by a sharp instrument like we use in the operating room. * * *" It was about 1½ inches in depth and had penetrated through the tissue into claimant's throat, severing his jugular vein and his posterior facial vein. In order to establish an air passage a tracheostomy was first performed in the operating room, following which the wound was lengthened so that repairs could be made, the veins were ligated, and the wound sutured. While claimant was in the emergency room, in an effort to determine whether any foreign bodies could be in the wound, the doctor asked him how he got hurt. Claimant's reply was to ask if he was a doctor. The doctor answered that he was, and again inquired of claimant how he had been hurt. Claimant "* * * shut up, didn't talk with me." Dr. Houston also asked claimant if someone had hurt him, but "* * * He wouldn't answer."

Dr. Houston estimated that altogether claimant lost approximately 80% of his circulating blood volume. In addition to the 500 cc's of Dextron administered by the nurse, 7 units or 3500 cc's of blood were administered to him in the hospital. Claimant sought to establish that he had sustained brain damage because of such loss of blood but Dr. Houston, on direct examination, while admitting such a result was possible, stated that there are many people who lose that amount without their mental faculties being altered; and on cross-examination testified that he felt confident that claimant had not suffered brain damage as a result of hemorrhaging or as a result of his incident. Dr. Meyer, who did not see claimant after the occurrence until he testified, stated in answer to hypothetical questions as to the effect of trauma, shock, and 80% loss of blood that, "All I have been able to read would indi-

cate anoxia can cause brain damage." He was not asked, however, whether in his opinion claimant had suffered any damage to his brain. Similar hypothetical questions were propounded to the doctor regarding whether a pre-existing nervous condition would be aggravated, and whether it would be sufficient to "aggravate" the symptoms of memory, change of personality, and depression reaction, to which the doctor replied that any kind of trauma can aggravate a depression and make it worse, and that according to what he had read the occurrences and condition mentioned could aggravate the symptoms mentioned.

Dr. Houston continued to see claimant for several days after August 24, 1964. The day following claimant wouldn't communicate with him, and claimant's refusal to talk continued. According to claimant's wife, during his convalescence he suffered from a lack of memory, would talk but at times the words did not come out right, and he would repeat the same questions. After his wound healed he was transferred to the psychiatric division of the hospital where he was treated by a Dr. William Arney. He remained there until November 20, 1964, when he was discharged, but continued as an out-patient, his medical status at the time of the hearing. Dr. Arney was not called as a witness.

There was a conflict in claimant's evidence regarding any requirement that a mechanic have a knife as one of the tools he was required to furnish. Claimant testified that a knife was on the employer's list of tools which he was required to furnish, and that he used his knife, " * * for cutting tape or 1–B tape or color coat tape or lines on various jobs, * * * " and for cutting or trimming seals. His witness, Barbeau, testified that a knife was not on the list of tools which a mechanic was required to furnish, and produced copies of the lists for all three grades of mechanics (including claimant's Grade 1), none of which mentioned a knife. Barbeau did testify, however, that

when claimant was under his supervision he was aware of the fact that claimant had a knife, but that the only purpose for which he ever saw claimant use his knife was to clean his finger nails. He was also aware that other mechanics had knives and had seen them use them to cut tape. There was no evidence that tape had been applied to door L–89 on which claimant had been working.

In addition to the testimony elicited from witnesses produced by claimant, the employer called Presley and Mueller to the stand. Presley testified that nothing about the work he had assigned to claimant would have required the use of a knife. He had been about 6 planes away from plane C–230 and was on his way back to ascertain whether claimant had completed his work when he learned of the incident. Claimant was lying on the stand when he arrived. After returning from the first aid room where claimant was taken he inspected the speed brake, flap, aileron and other parts to see if there was blood on the plane, but found none, and the only blood he saw was on the floor. He also testified that while all of the screws are not inserted in doors which have to be later reopened for final inspection, and tape is used to cover the empty screw holes, it was never used on doors like L–89 and L–86 which were underneath the plane's wings. Mueller testified that claimant was near him when he inspected the closed door at approximately 3:23 P.M., but that they didn't talk to each other, other than that he might have said "O.K." when he approved the work. Following his check he wet the decal at the wash stand about 135 feet from the rear of the plane, returned and applied the seal, and then walked to the call sheet kept at the rear of the plane where he logged his approval of the door. He then saw people going towards plane C–230 and looked and saw claimant standing "under there" bleeding. He explained that the speed brake and aileron were down and that he could only see claimant up to his shoulders. Claimant's arms were at his

side. Mueller also testified on cross-examination that about six weeks before August 25, 1964, claimant told him that the noise in the plant was bothering him, and that he would have blank spells for a minute and wouldn't know where he was; and that he was going to a doctor about it. On cross-examination Mueller was asked where claimant's hands were when he first saw claimant bleeding and answered, "I don't remember his hands." He was also asked whether he could remember if there was anything in either of claimant's hands that he could see, and replied in the negative.

Sergeant Julius Diefenbach and Patrolman James O'Mara of the St. Louis County Police Department also testified on behalf of the employer. In substance, they related that in response to a notice of a serious injury which their office received on August 24, 1964, they went to Deaconess Hospital in the evening of August 26th and sought permission to interrogate claimant. Permission was at first refused by the admitting office, but subsequently was given by a doctor whom the girl in the office telephoned. They related that after explaining to claimant that a routine investigation was being made and that they wanted to find out what had happened to him, they asked him questions but it was difficult for claimant to speak, and he didn't always answer. Diefenbach then wrote out three questions on a piece of paper and showed them to claimant. The first was, " * * * Did you cut yourself?" to which claimant wouldn't answer. The second was, " * * * Was it an accident?" to which claimant shook his head no. And the third was, " * * * Did someone else do it?" to which claimant also answered no.

Called by claimant in rebuttal, Rosemary S. Rombach, the registered nurse attending claimant in the hospital when he was interviewed, testified she at first had denied the police officers permission to see claimant because she didn't think he was in a condition to see them, but granted it when they told her they had permission from Dr. Green. She stated that she heard the police ask claimant whether he had cut himself, whether it was an accident, and whether some one else did it, to all of which questions claimant answered, " 'I don't know.' " She and claimant's wife were asked by the officers to leave the room, and during her entire examination no question was asked her regarding written questions shown to claimant. On cross-examination she conceded that the "Physicians Orders" part of the hospital record showed an entry on August 26, "Police officers may see pt." initialed by Dr. Houston, and that earlier that day Dr. Houston had ordered, "Walk A M & P M."; and that the progress report on the 25th showed that claimant was relatively doing fine, was conscious and could talk a few words. Claimant's wife, in rebuttal, stated that she had also protested against the interview.

In this court claimant asserts two points in his brief, each of which is divided into several subpoints. Considering them in the inverse order in which they appear, claimant maintains "That the Award of the Referee of the Division of Workmen's Compensation erred in denying compensation to the claimant, in violation of Section 287.490(1), (3) and (4), because: * * *" following which four grounds are stated. As to that complaint it is sufficient to state that whatever may have been the grounds upon which the Referee denied claimant's claim, it is the final award of the Industrial Commission that is reviewed by the courts and not the Award of the Referee. Section 287.490 RSMo 1959, V.A.M.S.; Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W.2d 136; Manning v. Manor Baking Co., Mo.App., 356 S.W.2d 505; Patane v. Stix, Baer & Fuller, Mo.App., 326 S.W.2d 402. Of course, as this court pointed out in the last cited case, the Referee's findings of fact and award are a part of the record in the case and will be given due consideration.

The fact of the matter is that the Referee found that the injury claimant had

sustained, "* * * was an intentional self-inflicted injury * * *" and denied compensation on that ground. But the Industrial Commission, while it affirmed the denial of compensation, did not agree with the Referee's finding, for in the concluding paragraph of its final award it specifically stated that the Referee's "* * * award insofar as it reflects the finding upon which such denial is based is hereby stricken * * *." However, the precise grounds upon which the Commission based its final award is a matter of dispute between the parties. Claimant, in his first point, contends that the Industrial Commission erred in finding, "That the facts and evidence found do not support the removal of this presumption," that is, the presumption referred to in Mershon v. Missouri Public Service Corp., supra. That argument, of course, presupposes that the presumption arose. The employer, for his part, argues that the presumption never arose in the first place; that if it did, sufficient substantial evidence to rebut it was offered, whereupon the presumption disappeared; and that upon the whole record the evidence was insufficient to sustain claimant's burden of proof that he was injured in an accident which arose out of and in the course of his employment. A careful study of the lengthy final award leads us to the conclusion that the Industrial Commission found: (1) that because the claimant was found during his work day with his throat cut, at a place where he had performed his duties, the presumption necessarily arose that he had been injured in an accident which arose out of and in the course of his employment; (2) that the employer produced substantial evidence to rebut the presumption, whereupon it went out of the case; and (3) that the claimant failed to carry his primary burden of proving that his injury was the result of an accident arising out of and in the course of his employment.

We have grave doubts that the presumption arose in this case, and that it must invariably arise in every case, merely because, without any consideration of the surrounding facts and circumstances, a claimant's evidence shows that during his working hours he was found injured at a place where his duties required him to be. It must be remembered that the burden of proof remains on the claimant throughout the case to show that he was injured in an accident which arose out of and in the course of his employment and such presumptions are merely, "* * * procedural (placing the burden upon the party denying their truth to produce evidence) * * *," Duff v. St. Louis Mining & Milling Co., 363 Mo. 944, 255 S.W.2d 792, 793. While the passage previously quoted from Mershon v. Missouri Public Service Corp., supra, read literally is subject to the interpretation placed upon it by the Commission, an analysis of the presumption cases reveals that it has never been so applied. In fact, as the Supreme Court pointed out in Kelley v. Sohio Chemical Co., Mo., 392 S.W.2d 255, 257, "* * * in fact, no Workmen's Compensation case actually decided on such a presumption is cited, nor have we found any." We are of the opinion that the presumption *may* arise but that in determining in the first instance whether it does consideration must be given to all of the relevant evidence which is developed and is binding upon claimant, including such evidence as the character of the work assigned to him, the machinery, tools and appliances employed in the performance of his duties, the manner in which his work is customarily performed, the condition of the prior health of the employee, the nature of his injury, and similar pertinent facts and circumstances. For as this court pointed out in Oswald v. Caradine Hat Co., Mo.App., 109 S.W.2d 893, 895: "* * * Of course, the nature of the injury, the condition of health of the employee, or the circumstances of the injury, may be such that the presumption does not arise. * * *" That addendum to the presumption rule was repeated by this court in Stamps v. Century Electric Co., Mo.App., 225 S.W.2d 493, 496, where we again pointed out, "It is true that when

an employee charged with the performance of a duty is found injured or dead at a place where his duty required him to be, a presumption may arise that his injury or death was by accident arising out of and in the course of his employment. Mershon v. Missouri Public Service Corporation, Mo.Sup., 221 S.W.2d 165; Oswald v. Caradine Hat Co., Mo.App., 109 S.W.2d 893. Of course it is recognized that the nature and circumstances of the injury or death may be such that the presumption does not arise, as where sufficient relevant facts are known as to bring the inquiry within the realm of actuality." It would appear that it was this addendum to the rule which the Supreme Court had in mind when it stated, in Kelley v. Sohio Chemical Co., Mo.App., 392 S.W.2d 255, 256: "* * * The existence of such a presumption, *under proper circumstances,* is also recognized in the following cases: (Citing cases, including our Oswald and Stamps cases.) * * * The cases fairly indicate that if there is evidence of occurrences, circumstances or physical condition which show, directly or by inferences, how the injury occurred, then the matter should be and will be decided on that evidence; * * *." (Emphasis supplied.)

In any event we are of the opinion that if any presumption arose in the instant case it was completely rebutted by the evidence developed by the employer from the claimant's witnesses as well as that introduced in its own part of the case, Kelley v. Sohio Chemical Co., supra; that the presumption thereupon went out of the case and the fact of whether claimant's injury was the result of an accident which arose out of and in the course of his employment was to be determined upon the evidence offered by both parties, Duff v. St. Louis Mining & Milling Co., supra; and that on the whole record claimant's proof was insufficient to show that his injury resulted from such an accident, Mershon v. Missouri Public Service Corp., supra.

The judgment is affirmed.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court. Accordingly, judgment affirmed.

ANDERSON, P. J., and WOLFE and RUDDY, JJ., concur.